# EXHIBIT 1



**Muriel Bowser**
Mayor

# GENERAL ORDER



**John A. Donnelly, Sr.**
Fire and EMS Chief

| SERIES | NUMBER | ORIGINATING UNIT | EFFECTIVE DATE | EXPIRATION DATE |
|--------|--------|------------------|----------------|-----------------|
| 2021 | 33 | OFC | June 16, 2021 | Until Revised |

**SUBJECT**

## Manual Change – Safety Operations Bulletin No. 10
## Donning and Use of Personal Protective Equipment

Make the following change to the D.C. Fire and EMS Department Operations Bulletin Book: replace Safety Operations Bulletin No. 10, *Donning and Use of Personal Protective Equipment (April 2020),* with the attached updated version of Safety Operations Bulletin No. 10, *Donning and Use of Personal Protective Equipment (June 2021).*

Section 4.1 has been updated to read: "Employees are responsible for complying with the PPE and safety standards contained in this policy, regardless of duty assignment or duty status."

John A. Donnelly, Sr.
Fire and EMS Chief

JAD:ES:ts

Attachments: Safety Operations Bulletin No. 10, *Donning and Use of Personal Protective Equipment (June 2021)*

BRAVERY ★ ACCOUNTABILITY ★ SAFETY ★ INTEGRITY ★ COMPASSION ★ SERVICE

# DISTRICT OF COLUMBIA
# FIRE AND EMERGENCY MEDICAL SERVICES DEPARTMENT

**Safety Operations Bulletin No. 10**                          **June 2021**

# DONNING AND USE OF
# PERSONAL PROTECTIVE EQUIPMENT

## 1.0   REFERENCES

1.1   Bulletin No. 28, *Religious Accommodation Policy*.

1.2   NFPA 1971, *Standard on Protective Ensembles for Structural Fire Fighting and Proximity Fire Fighting*.

1.3   District of Columbia Fire and EMS Department Respiratory Protection Plan.

## 2.0   POLICY

2.1   Employees shall wear/utilize protective clothing and equipment required to afford maximum personal protection during all types of emergency and non-emergency incidents.

2.2   No aspect of personal grooming is permitted to interfere with the form, fit, function, and/or interface of any type of personal protective clothing or equipment required for use by the employee.

2.3   No aspect of personal grooming is permitted to present a hazard to the employee in the course of performing his or her duties.

2.4   An employee affected by any part of this policy due to sincerely held religious beliefs or practices shall comply with Bulletin No. 28, *Religious Accommodation Policy*.

2.5   An employee affected due to other (non–religious) reasons shall submit a detailed Special Report to the Fire and EMS Chief through the member's Chain of Command describing the policy provision involved, and the specific effect on the employee.

2.6   Members who have a medical condition which prevents them from meeting these requirements shall be ordered to report to the Police and Fire Clinic (PFC) for an evaluation and referral to their private physician.  A member's duty status will be determined by the PFC.

### *Enforcement*

2.7   In applying these standards, Battalion Commanders shall enforce the requirements of Chapter 6 of the District of Columbia Fire and EMS Department Respiratory Protection Plan.

2.8   All personnel shall be in compliance with these requirements prior to assuming duty. Division and Battalion Commanders and Company Officers shall inspect personnel to assess and ensure their members are in compliance with these requirements at all times.

    2.8.1   Members that do not meet these requirements will not be permitted to assume duty. If a member cannot immediately come into compliance, the member shall be relieved from duty and placed on LWOP for the remainder of his/her tour of duty. Company Officers shall direct members not in compliance to submit a Special Report regarding their noncompliance and order the member to come into compliance by their next work day.

    2.8.2   Members who achieve compliance with these requirements by the next work day shall be restored to full duty and no further action will be taken. Those that do not comply with these requirements on the next and all subsequent work days will be directed to submit a Special Report regarding their noncompliance, ordered to come into compliance by their next work day and placed on administrative leave for the remainder of his/or her tour of duty during each subsequent occurrence.

2.9   Company Officers or employees having questions on how to interpret or comply with this policy shall bring those questions to their Battalion Fire Chief.

***Personal Protective Clothing and Equipment Standards - Requirements***

2.10   The Department's personal protective clothing and equipment requirements should include, but are not limited to:

    2.10.1  Structural firefighting PPE,

    2.10.2  Chemical protective PPE,

    2.10.3  Technical rescue PPE,

    2.10.4  Water rescue PPE, and

    2.10.5  Various types of respiratory protection to include:

        2.10.5.1  Self–Contained Breathing Apparatus (SCBA),

        2.10.5.2  Supplied Air Breathing Apparatus (SABA), and

        2.10.5.3  Air Purifying Respirators (APR's).

***Fire Suppression Incidents***

2.11   While responding to all incidents that potentially require fire suppression activities (i.e., automatic fire alarms, gas leaks, etc.), and while actually engaged in firefighting

activities, employees shall wear the full structural firefighting protective ensemble in accordance with NFPA 1971, *Standard on Protective Ensembles for Structural Fire Fighting and Proximity Fire Fighting,* and Self Contained Breathing Apparatus (SCBA) at a minimum.

### Other Incidents

2.12    Employees responding to other incident types shall comply with personal protective equipment selection guidelines and requirements contained in the appropriate Standard Operating Guideline (SOG), infection control procedure, and any other Department policy applicable to the incident.

### Grooming Standards Required for Safe Personal Protective Clothing and Equipment Usage

### Facial Hair

2.13    Employees are not permitted to have:

    2.13.1    Facial hair that comes between the sealing surface of the face piece and the face;

    2.13.2    Facial hair that interferes with the valve function; or

    2.13.3    Any condition that interferes with the face-to-face piece seal or valve function.

### Head Hair

2.14    The length of head hair shall be groomed so that, when the head is covered, the hair does not fall below the eyebrows or bunch out to the front, side, or rear of the headgear or extend below the shoulder.

    2.14.1    Occurrences to the contrary cause the potential for vision obstruction, contamination from harmful substances, and flammability risks in certain scenarios.

2.15    Head hair shall be worn by employees in a manner that prevents:

    2.15.1    Interference with a proper seal of any respiratory protection equipment;

    2.15.2    A risk of entanglement in equipment or machinery; and

    2.15.3    Contact with a patient during patient care.

2.16    The bulk of the hair shall not interfere with:

    2.16.1    The use of any respiratory protection equipment;

    2.16.2    Helmets or any other protective headgear from fitting and functioning as designed;

2.16.3  The use of structural firefighting hoods;

2.16.4  Closing the collar of the coat of structural firefighting PPE; and/or

2.16.5  The interface of all components listed above.

2.17  Hair restraints that are inconspicuous may be used to achieve compliance with these standards.

*Jewelry/Fingernails*

2.18  Earrings, rings, bracelets, and necklaces are permitted as long as they can be worn in a manner that:

2.18.1  Does not present an entanglement hazard;

2.18.2  Does not interfere with the donning or function of any type of personal protective clothing or equipment; and

2.18.3  Does not have the potential to compromise the integrity of the employee's clothing or equipment, including EMS gloves used for Body Substance Isolation (BSI) protection.

2.19  Fingernails shall be groomed to ensure that they:

2.19.1  Do not interfere with the donning or function of any type of personal protective clothing or equipment; and

2.19.2  Do not have the potential to compromise the integrity of the clothing or equipment, including EMS gloves used for BSI protection.

**3.0   DEFINITIONS**

3.1  *Employee(s)* – members required to comply with annual fit testing as outlined in Chapter 5 of the District of Columbia Fire and EMS Department Respiratory Protection Plan.

**4.0   RESPONSIBILITIES**

4.1  Employees are responsible for complying with the PPE and safety standards contained in this policy, regardless of duty assignment or duty status.

4.2  Company Officers shall ensure the proper donning and use of protective clothing and equipment to ensure the maximum safety of each employee at all times.

4.3  Supervisors shall ensure that each employee under their command is in compliance with the Department's safety standards prior to assuming duty.

# EXHIBIT 2

Celebrating 20 Years of Outstanding Service

# Expert Report
# Pollard v. District of Columbia
# Case 1:19-cv-03099-ABJ

Submitted to:

**Office of the Attorney General for the District of Columbia**
**Civil Litigation Division, Section IV**
**400 6th Street, NW**
**Washington, D.C. 20001**

January 12, 2021

Prepared by:



**1311 Haubert Street**
**Baltimore, MD 21230**
**p  410.659.9971**
**f  410.962.1065**

*Office of the Attorney General for the District of Columbia*
*Case No. 1:19-cv-03099-ABJ*
*Expert Report*
*January 12, 2021*



## Table of Contents

**1.0    Introduction & Qualifications**................................................................................ 1
**2.0    Informational Sources**.......................................................................................... 2
**3.0    Information Related to SCBAs**............................................................................ 3
    *3.1    General Information* ......................................................................................... 3
    *3.2    Fit & Use*........................................................................................................ 3
    *3.3    Applicability* .................................................................................................. 4
**4.0    Summary of Conclusions**.................................................................................... 5
**5.0    References** ........................................................................................................... 7

**Appendix A     Reference Documents**

1311 Haubert Street   |   Baltimore, MD 21230   |   **p**  410.659.9971   |   **f**  410.962.1065



# 1.0 Introduction & Qualifications

## 1.1    Executive Summary

Arc Environmental, LLC was retained by the Office of the Attorney General for the District of Columbia (OAG) in the matter of Pollard v. District of Columbia (Case No. 1:19-cv-03099-ABJ).  I was asked to determine whether the District's policies and practices regarding facial hair and the Self-contained Beathing Apparatus (SCBA) are consistent with national standards.

In performing this review and evaluation, Arc Environmental has relied upon the documents provided by the Office of the Attorney General, other publicly available documentation obtained by Arc Environmental during the course of this evaluation, and expertise in performing similar evaluations. Regulatory and/or industry standards established by the Occupational Safety and Health Administration (OSHA), National Institute for Occupational Safety and Health (NIOSH), National Fire Protection Association (NFPA), and the American Industrial Hygiene Association (AIHA) were utilized to ascertain the opinions and conclusions.

I have concluded, based on my review, that the District's policies and practices are consistent with Federal regulations, national standards, and manufacturer requirements.  Facial hair within any portion of the face where the facepiece is intended to create a tight-fitting seal, is not permitted by regulatory, industry, or manufacturer policies. Daily changes in facial hair growth, texture, and density create inconsistencies in fit testing and do not allow for proper fit and seal of tight-fitting respirators, which is imperative for protecting the health and safety of workers – particularly firefighters who work in Immediately Dangerous to Life or Health (IDLH) conditions. Furthermore, employers who allow passing fit tests when facial hair protrudes under the intended seal are considered non-complaint with OSHA's respiratory standard.

The opinions expressed herein are based on the body of documents reviewed to date.

## 1.2 Qualifications

This Expert Report was prepared by Arc Environmental, LLC, under the direction of Stacy Kahatapitiya, CHMM.

Arc Environmental is a consulting firm with core capabilities in the Industrial Hygiene and environmental assessment and remediation fields.  We provide professional services to private and public sector clients to address challenging and dynamic environmental health and safety issues.

Ms. Kahatapitiya has more than 19 years of experience in environmental consulting, Industrial Hygiene, and hazardous materials investigations for an array of clients including Federal agencies, state and local municipalities, commercial/industrial, developers, and insurance companies.  Her diverse client and project base have provided an opportunity to provide expertise in occupational safety and health assessments, including selection of Personal Protective Equipment (PPE); hazardous and regulated materials investigations; water and fire loss assessments; project design development; health and safety training; and regulatory compliance. She has previously executed remediation and clean-up projects under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for hazardous



and toxic contaminants, as well as providing expertise in site investigations, regulatory compliance, occupational exposure assessments, due diligence, and Private Qualified Professional services on Department of Defense projects involving remediation. Ms. Kahatapitiya has managed investigations and/or remediation actions to address such contaminants as silica, heavy metals, asbestos, polycyclic aromatic hydrocarbons (PAHs), dioxins, soot/carbon black, polychlorinated biphenyls (PCBs), formaldehyde, diisocyanate, and volatile organic compounds. Ms. Kahatapitiya has provided Industrial Hygiene services domestically as well as overseas, performing inspections and/or abatement oversight in South Africa, Germany, Kazakhstan, Botswana, Brazil, and Azerbaijan.

Ms. Kahatapitiya's current resume is included in Attachment 1. Her compensation for this matter is $325 per hour based on document review, report preparation, and testimony. Ms. Kahatapitiya has not testified in deposition or trial in the past four years.

**1.3 Report Contents**

This Expert Report contains the following sections:

- Section 2 presents summary of information sources from which Arc Environmental conducted its evaluation and upon which conclusions are based;

- Section 3 presents a summary of general information pertinent to the use of respiratory protection in hazardous environments, methodology, and results of Arc Environmental's review and evaluation of the information specific to the use of pressure-demand SCBA equipment and facial hair considerations;

- Section 4 presents a summary of conclusions for this Expert Report; and

- Section 5 lists the reference documents relied upon for the preparation of this Expert Report.

# 2.0 Informational Sources

Arc Environmental was provided with initial documentation from the Office of the Attorney General which included the declaration statement from Mr. Guidotti, the Plaintiff's Expert, and information related to the District of Columbia Fire and EMS Department's policies and standard operating procedures specific to the SCBA utilized by assigned personnel. In addition to the documentation provided by the OAG, Arc Environmental obtained and reviewed other publicly available documentation to support the opinions provided herein. This additional information was obtained through publicly available internet sites and sources, including user manuals, publications, and statements issues by regulatory or professional institutions.

Relevant facts identified from the information provided to Arc Environmental by the OAG, as well as other pertinent information obtained by Arc Environmental during the course of this review and evaluation are provided as Appendices to this Expert Report.



# 3.0 Information Related to SCBAs

### 3.1    General Information

Respiratory protection provides a last line of defense for individuals required to work in conditions where airborne hazards are present.  Firefighters, in particular, are required to have a high level of respiratory protection due to potential contaminants such as soot/black carbon, toxic fumes, and other hazardous or toxic air pollutants (such as asbestos) that may be present in ambient conditions during a response event. Unlike fire response and other emergency events, engineering practices can be designed and utilized to minimize the potential for contaminants to become airborne hazards in controlled settings. Due to the likelihood of fire response efforts being conditions that are immediately dangerous to life or health (IDLH) by their general nature, proper respiratory protection is imperative to the health and safety of those responding to such incidents.   Per the District of Columbia Fire and EMS Department Self Contained Breathing Apparatus Manual, statistics have shown that firefighters average a lifespan that is eight to 10 years shorter than non-firefighting peers and that the incident rate (reduced life span) is associated with exposure to poisonous gases.

A SCBA is the required respiratory protection for IDLH atmospheres.  The system utilized by firefighters includes a tight-fitting, full face piece attached via hose to a compressed gas cylinder that provides clean, breathable air to the user.  Firefighters of the District of Columbia Fire and EMS Department (FEMS) are issued Scott™ Air-Pak™ Fifty SCBAs which are mandatory for use in atmospheres which contain products of combustion.  The cylinders are rated for 60-minutes of air supply; however, due to work activities being performed, fit of the respirator, or the air demand established by the user, this supply time may differ from the rating. The tight-fitting face piece currently issued to these firefighters is the Scott™ AV-2000.  According to the manufacturer, 3M™, these facepieces, will be discontinued effective March 31, 2022, and replaced with newer technology which provide better fit and protection.

### 3.2    Fit & Use

The SCBAs utilized by FEMS are pressure-demand systems.  These systems supply air to the user from the compressed air cylinder based on user-demand (inhalation/exhalation). Pressure-demand (also referred to as positive pressure) mode is intended to ensure that the pressure inside the facepiece will remain positive.  Essentially, this pressure-demand system forces fresh, clean air into the face piece as opposed to pulling air into the facepiece from the ambient air outside the facepiece, which is affected with contaminants and potentially insufficient levels of oxygen.   In order for any provided respiratory protection to be effective, the facepiece must provide a proper seal for the user to ensure that contaminants do not enter the facepiece and become inhaled by the user. As asserted in the OSHA Standard Interpretation dated October 11, 1984, the use of a SCBA, "such as the Scott Air Pac, is not acceptable for bearded employees under emergency conditions" and as such "the employer would be in violation of [1910.134(g)(1)(i)(A)] if a bearded employee wore a SCBA under a true emergency situation".

In order to evaluate the intended seal, a fit test must be performed.  A fit test is designed to allow an assessment of the respiratory or facepiece seal under controlled conditions.  A fit test may be qualitative (pass or fail) or quantitative (measurable concentration).  There are a number of factors that can affect user fit and diminish the effectiveness of a tight-fitting respirator.  Among these are bone structure, facial



hair, skin conditions and scarring, dental changes, and weight fluctuations. Additionally, fit can be impacted significantly by how equipment is donned and doffed. As noted in a study performed by Skretvedt and Loshchiano, and referenced in the FEMS Respiratory Protection Plan, respiratory users experience a change of fit from one donning to another. This change in fit is likely more so evident when additional variables (such a facial hair) are introduced, as noted by the study and also recognized by OSHA in a number of issued Standard Interpretations for 29 CFR 1910.134.

OSHA's Standard Interpretation dated February 2, 1985, states that bearded persons cannot achieve a satisfactory seal, even with pressure-demand systems such as SCBAs. In their interpretation dated March 29, 1985, the Administration went on to state that facial hair growth rates, texture, and density vary, as does the fit of a respirator due to these factors. On November 26, 1985, OSHA further clarified that an individual must be clean shaven to ensure a proper seal between the tight-fitting facepiece and face. The interpretation notes that beards pose serious problems of acceptability because their texture and density vary greatly and therefore create a significant challenge to ensuring a consistent, tight seal.

### 3.3    Applicability

The question in this case pertains to whether facial hair (beard) is permissible and acceptable for the user, Mr. Pollard, in regard to the his SCBA use. As required under the OSHA respirator standard (29 Code of Federal Regulations 1910.134), "The employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have facial hair that comes between the sealing surface of the facepiece and the face". OSHA notes that no exemption exist in regard to this requirement and that employers who allow passing fit tests with facial hair are considered non-compliant with the standard.

The respiratory standard further requires that an additional fit-test be performed upon any noted change in conditions which vary from the initial conditions that were the basis for the existing (passing) fit test. OSHA states in their interpretation dated April 1, 2011, that firefighters must be clean shaven in order to have a proper fit, which is vital for individuals in IDHL atmospheres. Furthermore, the National Institute for Occupational Safety and Health (NIOSH), which issues recommendations and approvals for respirators, reiterates the support of OSHA's requirements in their documentation. The District of Columbia Fire and EMS Department Respiratory Protection Plan is also consistent with both of these requirements and states (in Appendix A) that "The fit tests shall not be conducted if there is any hair growth between the skin and the facepiece sealing surface…", a statement that is also contained within the National Fire Protection Association (NFPA) 1500™ "Standard on Fire Department Occupational Safety, Health, and Wellness Program".

Positive pressure-type respirators can have leakage paths that can cause aspiration of the outside atmosphere. With SCBAs, leakage rates will also have adverse impacts on the service life of the air cylinder. OSHA noted in their Standard Interpretation dated November 26, 1985, that even the slightest facial hair can significantly, adversely impact the protection of a positive-pressure systems, including SCBAs. The American Industrial Hygiene Association (AIHA) presented at their conference in 1992 that increases in leakage from the facepiece will directly and notably reduced the service life of the tank. In addition, research has demonstrated that even modest facial hair growth can have a significant adverse impact on the protection of a positive-pressure system. A study by McGee and Oestenstad (1983) found that protection provided by a closed-circuit pressure-demand SCBA decreased significantly for subjects who grew beards over the course of eight weeks and that, based on their findings, the use of closed-circuit



pressure demand SCBA devices by bearded individuals should be of significant concern when dealing with IDLH situations.

In reviewing the declaration from Mr. Guidotti regarding this case, it is noted that "beard length of about a quarter-inch does not impede the outward flow of air under positive pressure"; however, OSHA has stated in numerous interpretation letters that beards, in general, present "serious problems for tight-fitting facepiece respirators" due to the variability of their texture and density, making respiratory fit unreliable and therefore creating the potential for leakage and that individuals must be clean shaven to ensure a proper seal. OSHA Directive No. CPL 02-00-158 indicates that after more than one day of growth, Compliance Safety and Health Officers should be cognizant of facial hair that comes between the sealing surface of the respirator and the face, which may cause seal leakage. In this regard, one day of growth is typically much shorter in length than one quarter inch.

NFPA Standard 1500™, which is part of the standards considered to be best practices for fire response personnel and is also cross-referenced with the FEMS Respiratory Protection Plan, also indicates that respirators shall not be worn when an individual has a condition that would prevent a good face seal. The standard details that Employers shall not permit tight-fitting facepieces to be worn by employees who have facial hair that comes between the sealing surface of the facepiece and the face, regardless of any obtained fit test measurement. It is within this standard that the NFPA also identifies that members with beard or facial hair on any the area of the face that is intended to make the tight seal with the facepiece shall not be permitted to use respiratory protection at emergency incidents or in hazardous or potentially hazardous atmospheres. The prohibition to facial hair in these regards, under NFPA, extends to both negative and positive-pressure personal respiratory protection devices that rely on the face seal to provide maximum effectiveness.

# 4.0  Summary of Conclusions

OSHA Directive No. CPL 02-00-158 tasks Employers to establish and implement procedures for the proper use of respirators, including procedures for use of respirators in IDLH atmospheres. In doing so, it is imperative that Employers who have successfully and compliantly established such programs be able to enforce them in an effort to provide effective health and safety solutions to their employees. The District of Columbia Fire and EMS Department has established a compliant Respiratory Protection Plan, safety policies, and supporting user manuals to best ensure the health and safety of the firefighters and EMS personnel. The requirements outlined in these program and policy documents are consistent with OSHA regulations, NFPA best practices, NIOSH guidance, and the manufacturer of the facepiece, all of which are among industry standards for firefighters. Consistent among these organizations is the premise that facial hair, when located within the area of the face which is intended to create a seal to a tight-fitting facepiece, is not acceptable and poses an undue risk for potential seal leaks. Due to the typically hazardous atmospheres which firefighters enter, any potential leaks in the facepiece-to-face seal may allow contaminants to enter the facepiece if the ability of the facepiece to maintain positive pressure inside the mask is compromised. Ana improper seal also markedly reduces the service life of the air supply tank, which is an unnecessary risk in IDLH conditions; one that OSHA is charged to prevent and specifically refers to in their stance to not allow for exemptions to their facial hair restrictions.



The declaration from the Plaintiff's Expert indicates Mr. Pollard is sufficiently protected by the SCBA so long as the beard is no longer than one quarter inch and that exposure to an agent of IDLH is minimal to non-existent. However, per the manufacturer's Operations and Maintenance Instructions, 3M™ states that the respirator must and shall not be worn when conditions (including facial hair) prevent a good face to facepiece seal. OSHA directives reference that more than one day of facial hair growth is enough to prompt review of conditions and proper seal.  OSHA has consistency declared their stance on the implications of facial hair, particularly beards, and tight-fitting respirator facepieces – individuals with facial hair that enters the plane of the respirator seal cannot achieve a satisfactory seal and employers who allow passing fit tests under these conditions are deemed to be non-compliant with regulatory requirements.

In addition, FEMS Respiratory Protection Plan, as well as OSHA, requires that a SCBA be worn in all IDLH conditions. NFPA 1500 (updated for 2021) also indicates that SCBA must be provided by and worn for any operation where members could encounter atmospheres that are IDLH or potentially IDLH or where the atmosphere is undefined or hazardous. Despite SCBAs being positive-pressure systems, the effectiveness of these systems in protecting workers relies on the proper fit and seal of the facepiece to the wearer's face, which is why national standards (both regulatory and industry) require firefighters to be clean-shaven or at a minimum, not have facial hair at the seal of the facepiece to the face.

The above conclusions, other information contained in this Expert Report, and the documents relied upon in preparation of this report show that individuals donning tight-fitting facepieces should be not have facial hair within the area of the face where the seal is designed to occur in order to ensure effective protection.

I hereby certify that this report is a complete and accurate statement of all my opinions, and the basis and reasons for them, to which I will testify under oath.

Stacy Kahatapitiya, CHMM
Director of Industrial Hygiene
Arc Environmental, LLC



# 5.0 References

3M, 2020. Fire and Safety Questions and Answers, 3M™ Scott™ AV-2000 Transition.

Center for Disease Control, 2018.  2018-129, Filtering out Confusion: Frequently Asked Questions about Respiratory Protection.

District of Columbia Fire and EMS Department, 2013. Self Contained Breathing Apparatus Manual.

District of Columbia Fire and EMS Department, 2005. Respiratory Protection Plan.

E.C. Hyatt, J.A. Pritchard, C.P. Richards & L.A. Geoffion, 1973. Effect of Facial Hair on Respirator Performance, American Industrial Hygiene Association Journal, 34:4, 135-142, DOI: 10.1080/0002889738506822.

M. Balkhyour, 2013.  Evaluation of Full-Facepiece Respirator Fit on Fire Fighters in the Municipality of Jeddah, Saudi Arabia.  International Journal of Environmental Research and Public Health, ISSN 1660-4601, www.mdpi.com/journal.ijerph.

M. McGee & R. Kent Oestenstad, 1983.  The Effect of the Growth of Facial Hair on Protection Factors for One Model of Closed-Circuit, Pressure-Demand, Self-Contained Breathing Apparatus, American Industrial Hygiene Association Journal, 44:7, 480-484, DOI: 10.1080/15298668391405175.

National Fire Protection Agency, 2020, 1500™ Standard, Standard on Fire Department Occupational Safety, Health, and Wellness Program.

SCOTT™ Health & Safety, 2010.  Operating and Maintenance Instructions, SCOTT AIR-PAK® 50i, Industrial Pressure-Demand Self Contained Breathing Apparatus (SCBA).

T. Guidottim 2020.  Case 1:19-cv-03099-ABJ, Declaration of Tee L. Guidotti.

U.S. Department of Labor, 2014. CPL 02-00-158, Inspection Procedures for the Respiratory Protection Standard.

U.S. Department of Labor, 2016. Standard Interpretation / Facial hair and respirator fit.

U.S. Department of Labor, 1985. Standard Interpretation / Facial hair and respirator wearing.

U.S. Department of Labor, 1985. Standard Interpretation / Facial hair and the wearing of respirators.

U.S. Department of Labor, 1984. Standard Interpretation / Facial hair in the face sealing area is unacceptable.



U.S. Department of Labor, 1985. Standard Interpretation / Facial hair in the face sealing area is unacceptable.

U.S. Department of Labor, 2012. Standard Interpretation / Facial hair under seal of tight-fitting respirator.

U.S. Department of Labor, 1998. Standard Interpretation / Employee declination of medical evaluation; religious exemption for respirator use.

U.S. Department of Labor, 2011. Standard Interpretation / Clarification on firefighters with facial hair who enter IDLH atmospheres and use of a self-contained breathing apparatus.

U.S. Department of Labor, 2011. Standard Interpretation / OSHA's decision not to provide a religious exemption from the respiratory standard.

# EXHIBIT 3

Introduction: The Office of the Attorney General for the District of Columbia asked me to clarify some of the opinions expressed in my December 16, 2020 Report (the December 2020 Report). The clarification sought is expressed in this Supplemental Report under the headings provided below.

I.    The District of Columbia Fire and Emergency Services' (FEMS') fit test protocols set forth in its Respiratory Protection Plan (RPP) are consistent with national safety standards that are aimed at protecting operational firefighters.

   A.  Fit tests cannot be performed on individuals if facial hair is present within the sealing surface between the respirator facepiece and the face; any person or agency issuing fit tests under such circumstances would be in direct, willful violation of Federal regulations set forth by the Occupational Safety and Health Administration (OSHA).

   B.  Facial hair is unsafe when a firefighter is donning a self-contained breathing apparatus (or SCBA) because hair impedes the seal of these tight-fitting respirators. The National Institute of Occupational Safety and Health (NIOSH) issued a Conformity Assessment Interpretation Notice (2018) noting that "facial hair that lies along the sealing area of the respirator, such as beards, sideburns, moustaches, or even more than one day or 24-hours of growth of stubble, should not be permitted on employees who are required to wear respirators that rely on a tight facepiece fit." December 2020 Report, p. 213-240, NIOSH's recommendations are consistent with the studies performed by Balkhyour (published faculty researcher) and McGee (Certified Industrial Hygienist) and Oestenstad (published faculty researcher, PhD – Environmental Health Studies), showing that the presence of facial hair within the sealing area decreased the protection provided by tight-fitting facepiece systems and notably caused leaks in the facepiece seal.

   C.  Facial hair which interferes with the seal of the facepiece to the user's face creates unsafe, unnecessary conditions for firefighters and others entering potentially hazardous environments, even when donning positive pressure respirators.  As documented in the Department of Homeland Security U.S. Fire Administration/Technical Report Series, Special Report: Prevention of Self-Contained Breathing Apparatus Failures (November 2001), low-order failures of SCBA are associated with inadequate face-to-facepiece seals, resulting in air leakage.

       Additionally, numerous studies such as Bryant and Mensch (National Institute of Standards and Technology, 2011): *Characterizing Inward Leakage in a Pressure-Demand, Self-Contained Breathing Apparatus* have shown that inward leakage occurs in facepieces when the users require more air than what is being supplied through the pressure-demand system.  This act of over breathing has been studied for firefighters wearing SCBA; over breathing creates ambient or negative pressure within the facepiece which can allow contaminants outside the facepiece to enter the mask.  Over breathing, coupled with inadequate face-to-facepiece seals, creates a synergistic effect and adverse safety conditions for firefighters working in known and/or presumed hazardous environments.

D. Facial hair within the face-to-facepiece seal area is unsafe when donning a negative-pressure respirator due to the inability to create a proper seal and achieve intended fit factor. A fit factor is the ratio of a test agent concentration outside the respirator to the concentration of the test agent inside the respirator; this number is resultant from a quantitative respirator fit test.

Negative pressure respirators such as a N95 are appropriate for use in Emergency Medical Services (EMS). Per the 2017 update of the District of Columbia Fire and EMS Department *Emergency Medical Services Manual and Pre-hospitalization Treatment Protocols*, N95 respirators should be used when EMS personnel are treating a patient with a suspected or known airborne transmissible disease.

Unlike positive-pressure respirators, negative-pressure respirators provide the user with air supplied from outside the mask as opposed to a clean source of air such as a compressed cylinder. Negative pressure respirators – such as N-95s, half-face air-purifying respirators, and full-face, air purifying respirators – require the user to draw air into the facepiece through the act of inhalation. The air is pulled into the facepiece (after being drawn through the filtering element) via negative pressure created by the user's inhalation. Air purifying respirators selectively filter contaminants from the ambient air based on the type of filtering element present; examples of such contaminant situations include particulates, gases, vapors, and fumes. Because of the functionality of these types of respirators, they are only approved for atmospheres containing specific chemicals or compounds up to identified concentrations and can only be used when sufficient oxygen (greater than 19.5%) is available in the atmosphere/ambient air. A proper seal is required for negative pressure respirators in order to provide protection to the user from the contaminants in the atmosphere outside the facepiece; a breach or insufficient seal in the face-to-facepiece seal will allow contaminants into the facepiece.

Negative pressure respirators are not permitted in IDLH atmospheres. Negative-pressure respirators are a safety concern and are not permitted in hazardous conditions due to the ambient air outside the mask being contaminated or unfit for inhalation and respiration.

II. It is not feasible for a bearded firefighter to consistently maintain a proper seal even if the individual occasionally passes a fit test.

A. There are no respirators that are suited for the potential and known hazards that firefighters and/or emergency responders encounter during the course of their work that can safely and assuredly be used when a beard or other facial hair is present and interferes with the face-to-facepiece seal or valve function.

B. Improper respirator selection or use creates an unnecessary and potentially fatal hazard to the individual in hazardous atmospheres. Appropriate respirator selection for individuals who have facial hair within the sealing area would include hood respirator system where no tight-fitting seal is included as part of the protective face covering. However, hood respirator systems are not appropriate for Immediately Dangerous to Life and Health (IDLH) atmospheres encountered and presumed to be present during fire response efforts.

2

Hood-type Supplied Air Respirators (SARs) are intended for emergency escape only and are not designed or appropriate for engaged and continued firefighting efforts. Additionally, hood respirator systems rely on air being provided to the hood continuously; therefore, if connected to a tank such as with a SCBA, the air supply would quickly deplete.

C.  While it is possible that a bearded individual may at some point pass a fit test, there is no supportive evidence that an acceptable, protective fit is guaranteed.  It is unreasonable to seek to fit test an individual prior to donning a respirator in each instance of use, in addition to being a violation of policy and regulation to administer fit tests to individuals who have facial hair within the face-to-facepiece seal in the first place. Furthermore, the Occupational Safety and Health Administration (OSHA) has recognized that "…beards present a serious problem of acceptability because their texture and density vary daily, there is no consistency to respirator fit, and there is higher leakage." These inconsistencies, as recognized by OSHA, NIOSH, and independent, published studies do not provide a finite level of confidence that facial hair impeding the seal of a tight-fitting respirator is an acceptable health and safety risk for the donning firefighter.  The dynamics of such physical attributes may allow for a firefighter to pass a fit test one moment but fail in another; however, even so, it is imperative that a user be able to consistently (and at all times) pass a fit test in order to rely on the appropriate respirator to provide constant protection as designed and intended.

III.  Can you identify one fire department in the United States that permits its firefighters to wear beards?  What sort of breathing apparatus is used for those departments that permit firefighters to wear beards?

A.  No.  Standard Operating Procedures, Respiratory Protection Programs, Trainee Programs, Safety Bulletins, and other publicly available documents were obtained and reviewed in support of this Supplemental Report and none of the issuing fire departments or institutions permit firefighters to have facial hair within the face-to-facepiece seal.

IV.  Are the departments identified in heading III complying with national standards?  Are those departments risking the safety of their firefighters, their fellow firefighters, and the public?

A.  Yes, the policies and procedures of other reviewed fire departments are consistent within national standards, manufacturer standards, and regulatory requirements by not allowing bearded firefighters to be fit tested for and issued tight-fitting respirators. These policies ensure that optimal protection of the firefighters, their fellow firefighters, and the individuals affected by fire response.

_Stacy Kahatapitiya_
_____
Stacy Kahatapitiya, CHMM
Director of Industrial Hygiene
Arc Environmental, LLC

3

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------x
ELLIS POLLARD,               :
                             :
            Plaintiff,       :
                             :
            v.               : No. 1:19-cv-3099(ABJ)
                             :
DISTRICT OF COLUMBIA,        :
                             :
            Defendant.       :
-------------------------x

                        Alexandria, Virginia

                    Friday, September 17, 2021


Deposition of

                    SEAN EGAN

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 12:30 p.m.,

via Zoom teleconference, before Kendra Hammer of

Anderson Court Reporting, participating remotely

from Alexandria, Virginia, notary public in and

for the Commonwealth of Virginia, when were

present on behalf of the respective parties:

1    APPEARANCES:

2        On behalf of Plaintiff:

3                ELLEN K. RENAUD, ESQUIRE
                 Alan Lescht and Associates, P.C.
4                1825 K Street, N.W., Suite 750
                 Washington, D.C.  20006
5                (202) 463-6036

6        On behalf of Defendant:

7                MARTHA MULLEN, ESQUIRE
                 JOHN BARDO, ESQUIRE
8                Office of the Attorney General for the
                 District of Columbia
9                400 6th Street, NW.
                 Washington, D.C.  20001
10               (202) 727-3400

11

12                    *    *    *    *    *

13

14

15

16

17

18

19

20

21

22

1  have to be changed to a large or moved down to a

2  small.  So it will vary on why an individual may

3  fail and so the structure of the face has changed,

4  surgery, something has happened.

5      Q    Okay.  So how many times can they be

6  retested?

7      A    Well, there's no flat number in which

8  they can be retested.

9      Q    I'm just trying to understand what the X

10  there represents.

11     A    Ten.

12     Q    Okay.  So is ten the limit, how many

13  times they can be retested?

14     A    There is no limit.  We have no defined

15  limit.  It is -- it is our responsibility to

16  ensure that the member passes through the

17  respirator and if there's an -- and if -- worst

18  case scenario, we have to bring the member back

19  and we have to find an alternative respirator for

20  them, then that's what we will do.

21     Q    Okay, so if a member is tested, like you

22  said, in a small and fails, and you decide to try

Case 1:19-cv-03099-ABJ   Document 34-4   Filed 04/05/22   Page 26 of 66

1          COURT REPORTER:  This is the Court

2    Reporter.  The time is 1:55 p.m.  And we are going

3    off the record for a five- minute break.

4          MS. RENAUD:  Chief Egan, you indicated

5    that every member gets a copy of their fit test

6    results.  Is that correct?

7          THE WITNESS:  Yes.

8     Q    Okay.  And is that a piece of paper?  Oh

9    sorry.

10     A    Yeah, so it comes in two forms.  One's a

11   hard copy, paper that goes back to their -- is

12   issued to the member to go back to their personnel

13   jacket given to their platoon or company

14   commander.  They're also issued a fit test card,

15   which is laminated, which is a smaller version of

16   the 8-1/2 by 11.  The fit test record shows --

17   shows the respirator and shows the parameters in

18   which they pass the fit test.

19               (Deposition Exhibit No. 2 was

20               marked for identification.)

21          BY MS. RENAUD:

22     Q    Okay.  I'm actually gonna show you

1    2016?

2              THE WITNESS:  Physically, I don't know.

3    I would have to go back.  I believe that all of

4    the records have been produced.  Members are to

5    report on an annual basis for their fit test.

6         Q    And how do these reports get -- I don't

7    want to use the word "produced," but how do they

8    get generated?

9         A    Like this fit test report?

10        Q    Yes.

11        A    So post the member being fit tested, the

12   report is then generated at the conclusion of each

13   of the respirators that they're tested in.  So

14   this would be -- can you scroll down a little bit?

15        Q    Sure.

16        A    So this would be the full report and

17   then he is issued off of that, is issued a smaller

18   version for his fit test part, so this is the full

19   8-1/2 by 11.

20        Q    Okay.  Is it possible to go to the OHD

21   record database and look to see if there is a 2015

22   report?

1    -- or the volunteer organization to fit test the

2    run personnel in the appropriate respirator.  This

3    test was performed in 10-27-20, right?

4         Q    10-28.

5         A    What's that?

6         Q    It's 10-28, not 27.

7         A    Oh, I'm sorry.  I was looking at the

8    calibration.

9              MS. MULLEN:  I see -- oh.

10             THE WITNESS:  Yeah.  10-28.  Both of

11   them are on 10- 28, correct?

12             MS. RENAUD:  Yeah.

13             THE WITNESS:  Yeah.

14             MS. MULLEN:  Okay.

15             THE WITNESS:  So, why he was fit tested

16   by Fairfax?  It's highly unusual that we would

17   send members -- in fact, we don't send members out

18   to other jurisdictions to be fit tested.  This is

19   their fit test record.  And so he was tested in

20   two different sized space pieces on two different

21   tests.

22             BY MS. RENAUD::

1              MS. RENAUD:  He's answering just fine.

2    You don't have to --

3              MS. MULLEN:  Okay --

4              MS. RENAUD:  -- interrupt him.

5              MS. MULLEN:  -- I didn't think he'd

6    heard the question.

7              THE WITNESS:  So applied -- applied the

8    respirator to my face, and then attachments to the

9    OHD machine were then applied, and then something

10   happened.

11             BY MS. RENAUD::

12       Q    Did you -- so you used the respirator

13   you came in with?

14       A    I'm sorry, I didn't hear that question.

15       Q    You used the respirator that you came in

16   with?

17       A    Yes.

18       Q    Okay.  Were there other respirators in

19   different models and sizes that you could choose?

20       A    Yes, if necessary.

21       Q    Okay.  And then who put the mask on, you

22   did?

CERTIFICATE OF NOTARY PUBLIC

COMMONWEALTH OF VIRGINIA

I, Kendra L. Hammer, notary public in and for the Commonwealth of Virginia, do hereby certify that the forgoing PROCEEDING was duly recorded and thereafter reduced to print under my direction; that the witnesses were sworn to tell the truth under penalty of perjury; that said transcript is a true record of the testimony given by witnesses; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was called; and, furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_____

Notary Public, in and for the Commonwealth of Virginia

My Commission Expires: September 30, 2025

Notary Public Number 7916662

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
--------------------------x
ELLIS POLLARD,              :
                           :
          Plaintiff,       :
                           :
          v.               : No. 1:19-cv-3099(ABJ)
                           :
DISTRICT OF COLUMBIA,       :
                           :
          Defendant.       : Volume 2
--------------------------x
```

Alexandria, Virginia

Monday, September 27, 2021

Continued Deposition of

SEAN EGAN

a witness, recalled for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, continuing at approximately 10:02 a.m.,

via Zoom teleconference, before Mark Mahoney of

Anderson Court Reporting, participating remotely

from Alexandria, Virginia, notary public in and

for the Commonwealth of Virginia, when were

present on behalf of the respective parties:

1    Engine Company 4 at 2531 Sherman Avenue,

2    Washington, D.C., Fit Code at 900 hours.  What is

3    located at that particular address, sir?

4         A    Our mask room where we perform our Fit

5    test.

6         Q    Is that the only location where Fit

7    tests are performed?

8         A    Yes.

9         Q    And we have -- or excuse me -- FEMS has

10   a contract with a company that provides the

11   equipment for Fit testing; is that correct or not?

12        A    Yes.

13        Q    And do you know who the manufacturer of

14   the equipment is?

15        A    OHD is the Fit test equipment that we

16   use.

17        Q    Do you know what that stands for?

18        A    No.

19        Q    How long have you been purchasing that

20   equipment from that particular company?

21        A    As long as I can remember.  I -- I don't

22   recall the exact timeframe.

1    about it last week.

2          A    Give me just a second.

3          Q    Take your time.

4          A    Yes, I have it.

5          Q    And what is the date of that test?

6          A    10/28/2020.

7          Q    And is it Mr. Pollard's test that he had

8    performed in Fairfax?

9          A    I'm sorry.  Can you -- I -- I couldn't

10   hear you.

11         Q    Who performed this particular Fit test?

12         A    Fairfax County.  Looks like the last

13   name is Joplin.  Kelly Joplin.

14         Q    Would you look at the document and tell

15   us what was the face piece that Mr. Pollard wore

16   when he was Fit tested by Kelly Joplin?

17         A    He had two models AB2000 small, and then

18   AB2000 large.

19         Q    Was the model AV2000 small being used by

20   the Department in 2020?

21         A    They had not been issued in 2020.

22         Q    Were they issued in 2018?

1      A     I don't believe so.  The model that

2  would have been issued was a AV3000.

3      Q     Would the Department test Mr. Pollard,

4  and by "Department", I mean the department for

5  which he worked for, the DCFEMS?  Would they have

6  tested Mr. Pollard with a AV2000 face piece in

7  2020?

8      A     No, we would have changed that out to an

9  AV3000 HT.

10     Q     Thank you.  Now looking at this report

11 and returning to the document that's Bate-stamped

12 231, it's report that at the time of the Fit test,

13 Firefighter Pollard possessed an AV2000 model face

14 piece mask.  It goes on to say I want to ensure

15 that Firefighter Pollard was given his Fit test

16 with an AV3000 HT face piece mask in every size

17 available, small, medium, and large.  So was the

18 Department using the AV3000 face piece in 2018?

19     A     Yes.

20     Q     The report by Chief Faust goes on to say

21 we spent approximately 90 minutes testing with

22 these sizes.

1       Q    What were the other reasons that he

2   decided to accommodate both religious and this --

3   and for disability to allow people to have facial

4   hair?

5            MS. MULLEN:  Well, objection to the --

6            THE WITNESS:  Based on the local --

7            MS. MULLEN:  Objection to the form of

8   the question.  This has been asked and answered.

9   Chief Egan, you can go ahead and answer.

10           THE WITNESS:  Based on the

11  accommodations that the district has adopted for

12  religious beliefs to make it a holistic policy and

13  that's how the medical and I believe that's the

14  contributing -- those are the two contributing

15  factors in why the department changed the policy.

16           BY MS. RENAUD:

17      Q    Did the department determine that it was

18  safe for employees to have facial hair and wear a

19  respirator?

20      A    The department's position is to

21  determine an alternative respirator that will

22  accommodate the members, the -- based on the

1     mission.

2          Q     So what is the alternative respirator?

3          A     We added the APR and we added just

4     recently the hooded PAPR which does not require

5     Fit testing.

6          Q     So, are the employees revered back on

7     the field?

8          A     Some.  Yes.

9          Q     How come only some?

10         A     We're going -- right now, we -- the

11    hooded PAPRS and to arrive today and some of those

12    members will go back to their companies as soon as

13    the PAPRs arrive, disperse, and training is then

14    followed suit.  We have had some members that --

15    with facial hair requested facial hair

16    accommodations that have been Fit tested and

17    passed and have been returned to operations.

18         Q     Okay.

19         COUR REPORTER:  Can you stop sharing,

20    Ellen?  It'll be easier for -- to see the

21    speakers.

22              BY MS. RENAUD:

CERTIFICATE OF NOTARY PUBLIC

COMMONWEALTH OF VIRGINIA

I, Mark Mahoney, notary public in and for the Commonwealth of Virginia, do hereby certify that the forgoing PROCEEDING was duly recorded and thereafter reduced to print under my direction; that the witnesses were sworn to tell the truth under penalty of perjury; that said transcript is a true record of the testimony given by witnesses; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was called; and, furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Mark Mahoney*

**Notary Public, in and for the Commonwealth of Virginia**

**My Commission Expires: August 31, 2025**

**Notary Public Number 122985**



**EXHIBIT 5**

1               UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - -x

4    ELLIS POLLARD,              :

5            Plaintiff,          :

6      v.                        :    Civil Action No.

7    DISTRICT OF COLUMBIA,       :    1:19-cv-3099 (ABJ)

8            Defendant.          :

9    - - - - - - - - - - - - - -x

10

11             Deposition of WILLIE GILLIAM

12                Conducted Virtually

13               Thursday, July 1, 2021

14                  11:37 a.m. EST

15

16

17

18

19

20    Job No.: 383660

21    Pages: 1 - 71

22    Reported By: Michelle Taylor

1     Deposition of WILLIE GILLIAM, conducted

2   virtually:

3

4

5

6

7

8

9     Pursuant to notice, before Michelle Taylor,

10   Notary Public in and for the District of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22

1      A   She didn't work with me, she was the

2    previous manager before I was hired that worked

3    for the fire department.

4      Q   Okay.  What was her first name?

5      A   I believe it was Sheila Scott.  I'm not

6    sure how to pronounce it or spell it.

7      Q   Do you know why she left?

8      A   I believe from what I understand she

9    retired.

10     Q   And how often do you -- are you required

11   to fit test the employees in the fire department?

12     A   We are required to fit test them annually.

13     Q   And is that requirement written somewhere?

14     A   Yes.

15     Q   Have you tested Ellis Pollard annually?

16     A   Can you repeat that, please.

17     Q   Have you tested Ellis Pollard annually?

18         MS. ANTHONY:  I'm sorry to interrupt, but

19   Ellen, your voice trails off frequently.  So I can

20   hear you when you start a sentence but as you're

21   ending the sentence it gets lost.  So I just

22   wanted to let you know and I do apologize for

1     Q   Okay.  So what is the protocol?  Tell me
2  what you do.
3     A   We have the personnel put the face piece
4  on and we walk them through five steps.  Each step
5  is to try to challenge the mask to maintain a
6  pressure through different movements.  The first
7  step would just be normal breathing for eight
8  seconds.  The second one would be bend at the
9  waist for eight seconds.  The third would be
10 turning the head side to side for eight seconds.
11 And the fourth and fifth test will actually have
12 them physically remove the mask and re-don the
13 mask.
14    Q   And then what?
15    A   Take a deep breath and hold for eight
16 seconds.
17    Q   Okay.  So when you say the personnel, it's
18 usually a firefighter or somebody who works in
19 that capacity, correct?
20    A   Yes.
21    Q   Okay.  Does anyone assist them with
22 putting the mask on?

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2         I, Michelle Taylor, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the foregoing transcript is a true

5    and correct record of the testimony given; that

6    said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my

8    direction; that reading and signing was not

9    requested; and that I am neither counsel for,

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13     IN WITNESS WHEREOF, I have hereunto set my hand

14   and affixed my notarial seal this 26th day of July

15   2021.

16   My commission expires July 14, 2022.

17

18

19   _____

20

21   NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA

**EXHIBIT 6**

**DC FIRE AND EMS**



| DC Fire & EMS DEPARTMENT | Fit Test Result Report | Test Date: 09-15-2017  9:58:51 am |
|---|---|---|

## Ellis  Pollard

|  | Assignment | **E22** |
|---|---|---|
|  | MASK S/N |  |

| Mask: | **SCOTT AV3000 Large Full Face** | | |
|---|---|---|---|
| Challenge Pressure: | **0.58** | Protocol: | **REDON** |
| Last NIST Calibration: |  | Respiratory Rate: | **53.80** |
| Minimum Passing Fit Factor: | **500** | Last Daily Calibration: |  |
| Other: |  | Serial No: | **3826** |
| Notes: |  |  |  |

| Step Number: | Fit Factor: | Leak Rate: |
|---|---|---|
| 1  Don & Face Forward | 65 | 831 |
| 2  Bend at the Waist & Face Forward | 54 | 990 |
| 3  Shake Head & Face Forward | 85 | 636 |
| 4  Redon & Face Forward | 70 | 767 |
| 5  Redon & Face Forward | 68 | 786 |
| **Test Result:** | **66** | **802** |

## FAIL

*W.GILLIAM*

*Ellis  Pollard*

D.C. 2019-cv-03099 (ABJ) - 000240

# EXHIBIT 7

**DC FIRE AND EMS DEPARTMEN (2021)**
OHD Quantifit® Respirator Fit Test

████████

**SCOTT, AV-3000 HT**
**Full Face Large**
Tested by BILL DUNLEAVY on 04-04-22
Using SCBA Protocol
**Overall Fit Factor:  2,523   PASS**

Medical Evaluation Date:  06-15-21


**DC FIRE AND EMS DEPARTMEN (2021)**
OHD Quantifit® Respirator Fit Test

████████

**SCOTT, VISION C5**
**Full Face Large**
Tested by BILL DUNLEAVY on 04-04-22
Using SCBA Protocol
**Overall Fit Factor:   976    PASS**

Medical Evaluation Date:  06-15-21


**DC FIRE AND EMS DEPARTMEN (2021)**
OHD Quantifit® Respirator Fit Test

████████

**3M 6500 SERIES, RUGGED COMFORT**
**Half Mask Large**
Tested by BILL DUNLEAVY on 04-04-22
Using REDON (APR) Protocol
**Overall Fit Factor:  1,352   PASS**

Medical Evaluation Date:  06-15-21

**EXHIBIT  8**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                                 :
IN THE MATTER OF:                :
                                 :
ELLIS POLLARD,                   :
                                 :
          Plaintiff,             :
                                 :
     v.                          :    Case No.
                                 :    2019-cv-03099
DISTRICT OF COLUMBIA,            :
                                 :
          Defendant.             :
                                 :
_____ :

          Wednesday,
          May 26, 2021

DEPOSITION OF:

               ELLIS POLLARD

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition, via

Video Teleconference, when were present on behalf

of the respective parties:

**APPEARANCES:**

On Behalf of the Plaintiff:

ELLEN K. RENAUD, ESQ.
Alan Lescht & Associates, P.C.
1825 K Street, N.W., Suite 750
Washington, DC 20006
202-852-8483
ellen.renaud@leschtlaw.com

On Behalf of the Defendant:


JOHN J. BARDO, ESQ.

MARTHA J. MULLEN, ESQ.

Office of the Attorney General for the

District of Columbia

400 6th Street, N.W.

Washington, DC 20001

202-724-6534

john.bardo@dc.gov

1        join the Fire Department.

2              Q     All right.  So we're going to get more

3        into your -- the various tasks you've held at the

4        Fire Department in a moment.  But let's discuss

5        first your -- you're a Muslim; correct?

6              A     Yes sir.

7              Q     Were you born a Muslim?

8              A     No sir.

9              Q     What faith were you born into?

10             A     Christianity.

11             Q     And when, when did you convert to

12       Islam?

13             A     Approximately around 2012.  I'm not

14       sure of the exact date right now.

15             Q     What -- tell me a little bit about

16       what made you decide to convert from Christianity

17       to Islam?

18             A     I found a lot of truth in Islam, you

19       know, and compared to Christianity I guess you

20       could say.

21             Q     How did you first get introduced to

22       Islam?

1   for sure in the earlier part of me being Muslim,

2   yes.

3        Q     How long, how long is the beard

4   supposed to be?

5        A     According to -- be more specific

6   please.

7        Q     Your religious practice how long -- it

8   requires you to have facial hair.  How long does

9   the facial hair have to be?

10        A     As long as it grows.  You can cut it

11   after somebody's able to take a handful.

12   Anything after that, you can cut it.  But

13   anything before that, you're supposed to keep it.

14        Q     Let's now go into some of the, some of

15   the roles you've had with FEMS.  So you, and FEMS

16   I'm referring to the D.C. Fire and Emergency

17   Medical Service, Fire and Emergency, yes.  You

18   mentioned that you were hired, you were brought

19   on as a cadet.  Tell me about that?

20        A     The cadet program, as I was told, they

21   take inner city kids who may not have had a

22   chance because of the neighborhoods we live in,

1    sure.  I don't know what year he got there.

2          Q     Was it prior to 2015 when you had this

3    EEOC agreement?

4          A     I don't know.  I'm unsure.

5                MS. RENAUD:  I'm going to object.

6    He's already answered that he's unsure.

7                BY MR. BARDO:

8          Q     Okay.  Well, he seems to have a lot of

9    trouble remembering dates.  I'll keep going.  Are

10   you currently permitted to wear a kufi at work?

11         A     Day work status?

12         Q     Yeah.

13         A     No.  No one has said anything to me

14   about my kufi.

15         Q     So you wear it to work every day and

16   nobody objects?

17         A     I can't remember anybody saying

18   anything about my kufi, no sir.

19         Q     Did anybody besides Lieutenant Lorentz

20   ever comment on your kufi?

21         A     Anyone?

22         Q     Yes.

```
1    4:36 p.m.)

2              BY MR. BARDO:

3         Q    Before we -- before we took a break,

4    you were talking about the -- your most recent

5    fit test.  When was your most recent fit test in

6    D.C.?

7         A    I can't remember.  After COVID, things

8    changed in the mask room.  So I'm not too sure.

9         Q    It was before COVID then?

10        A    Yes.

11        Q    So it was before March of 2020?

12        A    Yes.

13        Q    And did you pass that fit test?

14        A    In D.C.?

15        Q    Yes.

16        A    No, not to my knowledge.

17        Q    Have you passed a fit test since you

18   were removed from Operations in D.C.?

19        A    Not to my knowledge, no.

20        Q    You said you took a fit test in

21   Virginia.  What was that about?

22        A    Took a fit test with a certified
```

1          A     Yep.

2          Q     So what -- in making this request,

3     what specific religious accommodation did you

4     want for making this request?

5          A     I just wanted my job.  I didn't want

6     to be terminated.  That's, you know.  I just

7     wanted to save my job.  So whatever -- that's the

8     only thing I could say is the reason why I

9     submitted it.

10         Q     Was this because of the beard?

11         A     Yeah.  The accommodation?  Yes, the

12    beard, yes.

13         Q     What about because of the pants?  Were

14    you -- you were allowed to wear your pants by

15    this point though; correct?

16         A     I was allowed, but still allowed to be

17    harassed as well, you know.  So even though I had

18    them, it still was harassment.  But the request

19    -- I'm sorry.

20         Q     The request, go ahead.

21         A     The religious accommodation request

22    form, it was done encouragement.  It was

1        Q    You testified earlier though, that

2    you're still being paid at a technician's rate.

3    Is that, is that true?

4        A    I think, I think I'm getting -- I'm

5    not getting paid the same as I would  Operations.

6    But if you're saying as a technician on day work,

7    yes.  They did not remove my rank.  I'm still

8    being paid as a technician who's on day work.

9    Not as a technician who's in Operations.  There's

10   a difference in pay.

11       Q    Okay.  What's the difference in pay?

12       A    I'm unsure.  I'm not payroll to give

13   you an exact answer.  There's a difference.  I'm

14   not sure about the amount of what it is.

15       Q    But your hourly -- so your hourly rate

16   dropped when you were assigned to day work?

17       A    I'm unsure.  I can't answer that.  I'm

18   unsure.  I just know the amount of hours that we

19   work it's a difference.  It's a 40 hour week from

20   a 48 hour week.  Two 24 hour shifts when you're

21   on day work, I mean I'm sorry.  When you're on

22   shift work you work 48 hours a week, versus

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: Ellis Pollard

In the matter of: Ellis Pollard v DC

Before: US District Court

Date: 05-26-21

Place: teleconference

were duly recorded and accurately transcribed under my direction; further, that said transcript is a true and accurate record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this action in which this deposition was taken; and further that I am not a relative nor an employee of any of the parties nor counsel employed by the parties, and I am not financially or otherwise interested in the outcome of the action.

------------------------
Court Reporter

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

# EXHIBIT 9

```
1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLUMBIA

3       --------------------------------X

4       ELLIS POLLARD,                  :

5                    Plaintiff          :

6              v.                       :Civil Action No.

7       DISTRICT OF COLUMBIA,           :1:19-cv-3099(ABJ)

8                    Defendant.         :

9       --------------------------------X

10

11              Deposition of GREGORY DEAN

12                  Virtually Conducted

13               Tuesday, July 13th, 2021

14                  12:30 p.m. (EST)

15

16

17

18

19

20      Job no.: 384659

21      Pages 1 - 43

22      reported by: Stefanie Towns, CCR
```

1           Deposition of GREGORY DEAN, Conducted

2    Virtually:

3

4

5

6

7

8

9

10

11

12

13           Pursuant to agreement, before Stefanie

14    Towns, Notary Public in and for the District of

15    Columbia.

16

17

18

19

20

21

22

```
 1              A P P E A R A N C E S

 2

 3         ON BEHALF OF PLAINTIFF:

 4         TAMARA SLATER, ESQUIRE

 5         ELLEN K. RENAUD, ESQUIRE

 6         ALAN LESCHT AND ASSOCIATES

 7         1825 K Street, N.W.

 8         Suite 750

 9         Washington, D.C. 20006

10         202.463.6036

11

12         ON BEHALF OF DEFENDANT:

13         MARTHA MULLEN, ESQUIRE

14         OFFICE OF ATTORNEY GENERAL FOR THE

15         DISTRICT OF COLUMBIA

16         400 6th Street, N.W.

17         Washington, D.C. 20001

18         202.727.3400

19

20  Also In Attendance:

21  John Bardo, Esquire

22
```

1          accommodation, and just discuss what steps

2          that firefighter would need to go through to

3          get a decision on that request.

4     A.   I don't know that I could give you an

5          accurate but give you from a fire chief's

6          perspective is that the request is through

7          EEO.  EEO does the background checks, does

8          their -- their review.  They have that

9          discussion with the chief of staff and then

10         they decide whether to recommend to or not

11         to.  That's how I envision it works.

12    Q.   Okay.  And on how many occasions have you

13         made a decision with regard to a religious

14         accommodation request?

15    A.   Again, I don't remember having had made a

16         decision on any of these.

17    Q.   Okay.  Do you, an apology for any redundancy

18         but do you recall making a decision with

19         regard to Mr. Pollard's accommodation

20         request?

21    A.   I believe that Mr. Pollard's accommodation

22         request was still pending and the issue dealt

1    with the fact that he could not return to

2    operations because we could not get him in a

3    self-contained breathing apparatus face piece

4    that prevented him -- prevented him from

5    having leaks.

6  Q.  Okay.  And in terms of the fit test what was

7    the specific accommodation that was being

8    held up as a result of the fit test?

9  A.  I don't know that anything was being held up.

10    I believe that he had failed his fit test.  I

11    was made aware of that and asked about

12    different face pieces.  He was then tested

13    again and the manufacturer came in and tried

14    a number of different face pieces to see if

15    he -- if we could find a fit for him to get

16    him a seal.

17  Q.  Okay.  And were you present for that fit

18    test?

19  A.  I was not.

20  Q.  Do you know if there was any documentation

21    with regard to the manufacturer coming in?

22  A.  I believe the people that would know that

1     list of people.  The EEO officer, chief of

2     staff, myself.  Not necessarily me but once

3     it's been approved, there's a form forwarding

4     that information so everybody knows what's

5     going on.

6  Q.  Okay.  I understand.  Okay.  So it sounds

7     like it would be your office that would make

8     sure everyone was notified?

9  A.  Probably the EEO officer -- probably more the

10    EEO officer than my office.

11  Q.  Okay.  So we talked a little bit about fit

12    tests during your time as chief of police,

13    did you -- were you ever fit tested?

14  A.  It was fire.  But, no, I was not fit tested.

15  Q.  My apologies.  Thank you.  Did you observe

16    any fit tests?

17  A.  I did not.

18  Q.  What would happen if a firefighter failed a

19    fit test?

20  A.  What should happen is the member should be

21    removed from operations until either an

22    appropriate fitting mask is done so we can

1      accommodate -- accommodate them.  And should

2      have been started from the time they came in

3      and as we know it, the age our faces get

4      fuller and continue to have to change out so

5      that's why we have the fit test to make sure

6      that a critical piece of safety equipment is

7      there.

8   Q.  Okay.  If somebody fails -- you were

9      describing what should happen.  Was that --

10     is that always what happened when a

11     firefighter failed a fit test?

12         MS. MULLEN:  Well, objection as to the

13     form of the question.

14  Q.  If you understand the question, you can

15     answer, Chief Dean?

16  A.  Having not done the fit test or witnessed the

17     fit test, I'm only going by what was done in

18     policy.

19  Q.  Okay.  Were you aware of firefighters with

20     beards taking fit tests or being fit tested,

21     rather?

22  A.  I -- I was.

1          CERTIFICATE OF REPORTER - NOTARY PUBLIC

2          I, Stefanie Towns, the officer before whom the

3     foregoing deposition was taken, do hereby certify

4     that the foregoing transcript is a true and correct

5     record of the testimony given; that said testimony

6     was taken by me and thereafter reduced to

7     typewriting under my direction; that reading and

8     signing was not requested; and that I am neither

9     counsel for, related to, nor employed by any of the

10    parties to this case and have no interest,

11    financial or otherwise, in its outcome.

12          IN WITNESS WHEREOF, I have hereunto set my

13    hand and affixed my notarial seal this 22nd day of

14    July 2021.

15

16    *Stefanie Towns*

17    _____

18    Stefanie Towns

19

20

21

22