**EXHIBIT 10**

```
1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    --------------------------------X

4    ELLIS POLLARD,                  :

5              Plaintiff            :

6         v.                        :Civil Action No.

7    DISTRICT OF COLUMBIA,          :1:19-cv-3099(ABJ)

8              Defendant.           :

9    --------------------------------X

10

11            Deposition of DAVID FOUST

12              Virtually Conducted

13            Tuesday, July 13th, 2021

14               11:00 a.m. (EST)

15

16

17

18

19

20   Job no.: 384659

21   Pages 1 - 37

22   reported by: Stefanie Towns, CCR
```

1          Deposition of DAVID FOUST, Conducted

2     Virtually:

3

4

5

6

7

8

9

10

11

12

13          Pursuant to agreement, before Stefanie

14     Towns, Notary Public in and for the District of

15     Columbia.

16

17

18

19

20

21

22

```
 1              A P P E A R A N C E S

 2

 3         ON BEHALF OF PLAINTIFF:

 4         TAMARA SLATER, ESQUIRE

 5         ELLEN K. RENAUD, ESQUIRE

 6         ALAN LESCHT AND ASSOCIATES

 7         1825 K Street, N.W.

 8         Suite 750

 9         Washington, D.C. 20006

10         202.463.6036

11

12         ON BEHALF OF DEFENDANT:

13         MARTHA MULLEN, ESQUIRE

14         OFFICE OF ATTORNEY GENERAL FOR THE

15         DISTRICT OF COLUMBIA

16         400 6th Street, N.W.

17         Washington, D.C. 20001

18         202.727.3400

19

20   Also In Attendance:

21   John Bardo, Esquire

22
```

1      are -- I am not familiar with the current

2      models but prior models you had a small,

3      medium, and large.  So if there was an

4      employee that was not successful with one

5      size of the mask, they could -- the person

6      performing the test could give a different

7      size mask and see if it was -- if the

8      employee was then successful with receiving a

9      seal and a passing of that fit test.

10  Q.  And the fit test for Mr. Pollard that you

11      witnessed that you believe was maybe in 2018,

12      what was done specifically for him after he

13      failed that fit test?

14  A.  Well, we tried -- he was there for a long

15      time.  We tried every size mask that the

16      manufacturer provides.  We also provided that

17      padding that the manufacturer provides.  And

18      then we called -- we called the manufacturer

19      to see if there was any type of mask that

20      maybe we didn't have in stock or that was

21      available or was compatible with the

22      self-contained breathing apparatus that the

1          fire department used at that time, and there

2          was -- we exhausted all those avenues.  There

3          was nothing else to try.

4     Q.   Okay.  And you're referring to a "we" who

5          else was there at the time?

6     A.   Well, the person performing the fit test.

7     Q.   Do you remember who that was?

8     A.   Willie.  Gillian I think is his last name.

9          I'm not exactly sure.  I'm sorry.  Just call

10         him Willie.

11    Q.   Okay.  Thank you.  So what -- have you

12         previously witnessed or -- have you

13         previously witnessed a firefighter trying to

14         get a fit test?

15    A.   Sure.  I received fit tests.  Every employee

16         that's in a hazard -- deemed a hazard

17         employee operationally is required annually

18         to perform or receive a fit test.  So I was

19         hired in 1986.  I've had 33 fit tests in my

20         career before I retired.

21    Q.   Okay.  And just to clarify, those are your

22         own fit tests, is that what you're referring

1           CERTIFICATE OF REPORTER - NOTARY PUBLIC

2           I, Stefanie Towns, the officer before whom the

3      foregoing deposition was taken, do hereby certify

4      that the foregoing transcript is a true and correct

5      record of the testimony given; that said testimony

6      was taken by me and thereafter reduced to

7      typewriting under my direction; that reading and

8      signing was not requested; and that I am neither

9      counsel for, related to, nor employed by any of the

10     parties to this case and have no interest,

11     financial or otherwise, in its outcome.

12          IN WITNESS WHEREOF, I have hereunto set my

13     hand and affixed my notarial seal this 21st day of

14     July 2021.

15

16          *Stefanie Towns*

17     _____

18     Stefanie Towns

19

20

21

22

**EXHIBIT 11**

## FIT TEST REPORT
### 10/28/2020

| | | | |
|---|---|---|---|
| **ID NUMBER** | 1728 | | |
| **LAST NAME** | POLLARD | **CUSTOM1** | |
| **FIRST NAME** | ELLIS | **CUSTOM2** | |
| **COMPANY** | DC FIRE | **CUSTOM3** | |
| **LOCATION** | DC | **CUSTOM4** | |
| **TEST DATE** | 10/28/2020 13:59 | **PORTACOUNT S/N** | 8030154404 |
| **DUE DATE** | 10/28/2021 | **N95 COMPANION** | N |
| **RESPIRATOR** | SCOTT AV2000 AV2000 [1000] | **PROTOCOL** | OSHA 29CFR1910.134 |
| **MANUFACTURER** | SCOTT | **PASS LEVEL** | 1000 |
| **MODEL** | AV2000 | | |
| **MASK STYLE** | AV2000 | **APPROVAL** | KJ |
| **MASK SIZE** | SMALL | **EFFICIENCY<99%** | False |

| EXERCISE | DURATION (sec.) | FIT FACTOR | PASS |
|---|---|---|---|
| NORMAL BREATHING | 60 | 7369 | Y |
| DEEP BREATHING | 60 | 16677 | Y |
| HEAD SIDE TO SIDE | 60 | 7034 | Y |
| HEAD UP AND DOWN | 60 | 5794 | Y |
| TALKING | 60 | 1983 | Y |
| GRIMACE | 15 | Excl. | |
| BENDING OVER | 60 | 3485 | Y |
| NORMAL BREATHING | 60 | 9818 | Y |
| **OVERALL FF** | | 4988 | Y |

FIT TEST OPERATOR _Kelly Joplin_   DATE 10/28/20
JOPLIN

NAME _Ellis Pollard_   DATE 10/28/20
ELLIS POLLARD

Note:

### Respirator Fit Test Card
Name: ELLIS POLLARD     Test Date: 10/28/2020
ID: 1728     Next Test Date: 10/28/2021

| **Respirator** | **Results** |
|---|---|
| Mfg: SCOTT | Overall FF: 4988 |
| Model: AV2000 | FF Pass Level: 1000 |
| Style: AV2000 | Pass: Y |
| Size: SMALL | Operator: JOPLIN |

Protocol: OSHA 29CFR1910.134
Fit Test Method: QNFT using TSI PortaCount
*** Your company contact information here ***

EP169

| Fairtfax County Fire & Rescue | Fit Test Result Report | Test Date: 10-28-20   2:23:25 pm |
|---|---|---|

## Ellis  Pollard

### 1728

Department:

Mask:    **Av2000 Scott Large Full Face**

| | | | |
|---|---|---|---|
| Challenge Pressure: | **1.50** | Protocol: | **SCBA** |
| Last NIST Calibration: | **05-29-20** | Respiratory Rate: | **93.10** |
| Minimum Passing Fit Factor: | **500** | Last Daily Calibration: | **10-27-20** |
| Other: | | Serial No: | **6801** |

Notes:

| Step Number: | Fit Factor: | Leak Rate: |
|---|---|---|
| 1  Face Forward | 773 | 120 |
| 2  Bend Over | 1098 | 84 |
| 3  Shake Head | 1825 | 51 |
| 4  Redon 1 | 2363 | 39 |
| 5  Redon 2 | 887 | 105 |
| **Test Result:** | **1162** | **80** |

### PASS

*Kelly Joplin*

*Ellis  Pollard*

EP170

# EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

+ + + + +

_____
                                :
IN THE MATTER OF:               :
                                :
ELLIS POLLARD,                  :
                                :
          Plaintiff,            :
                                :
     v.                         : Case No.
                                : 2019-cv-03099
DISTRICT OF COLUMBIA,           :
                                :
          Defendant.            :
                                :
_____:

                    Friday,
                    September 17, 2021

DEPOSITION OF:

                    KELLY JOPLIN

called for examination by Counsel for the Defendant,

pursuant to Notice of Deposition, via Video-

Teleconference, when were present on behalf of the

respective parties:

**APPEARANCES:**

**On Behalf of the Plaintiff:**

ELLEN K. RENAUD, ESQ.
TAMARA L. SLATER, ESQ.
Alan Lescht & Associates, P.C.
1825 K Street, NW
Suite 750
Washington, DC 20006
202-463-6036
ellen.renaud@leschtlaw.com

**On Behalf of the Defendant:**

JOHN J. BARDO, ESQ.
Assistant Attorney General
MARTHA J. MULLEN, ESQ.
Senior Assistant Attorney General
Office of the Attorney General for the District of
Columbia
400 6th Street, NW
Washington, DC 20001
202-724-6534 (Bardo)
202-724-6612 (Mullen)
john.bardo@dc.gov
martha.mullen@dc.gov

1    than the 2000?

2         A     I can't say that.  I don't know.  It's

3    newer, I can say that.

4         Q     Does Fairfax County use the AV-3000?

5         A     We have in the past.  We no longer use

6    that.  We use the AV-3000 HT.

7         Q     Do you use the AV-2000?

8         A     We have in the past.

9         Q     When did you stop using the AV-2000?

10        A     It's been over ten years, I'd say.

11        Q     So you tested Mr. Pollard in a mask that

12   Fairfax County hasn't used in over ten years?

13        A     That's probably correct.

14        Q     Are you aware that the AV-2000 has been

15   recalled?

16        A     I've seen notices, we don't get them so

17   they're not really pertinent to me.

18        Q     Do you frequently fit test Fairfax County

19   firefighters on the AV-2000?

20        A     No, I never have.

21        Q     Why did you choose then to fit test Mr.

22   Pollard on the AV-2000?

1    you did not try the AV 3000, correct?

2          A     Correct.

3          Q     And finally, how did you -- so who told

4    you to fit test Mr. Pollard?

5          A     My supervisor, Kirk Speier.  He told us,

6    I don't have a time, I explained this earlier, I don't

7    have a time or a date, but he did come in and say

8    someone from DC is coming with a beard to be fit

9    tested.  Because we have a TSI PortaCount and they do

10   not.

11         Q     Did you ask him why you needed to do this

12   fit test?

13         A     No, it made sense to me if they want to

14   try a different type of machine.

15         Q     Were you aware that at that time that this

16   person was suing the District of Columbia?

17         A     No, I was not.

18         Q     When did you first become aware of that?

19         A     I don't -- I don't recall.

20         Q     Was it when I subpoenaed you to appear for

21   this deposition?

22         A     I believe I knew prior to that.

C E R T I F I C A T E

This is to certify that the foregoing transcript

Deposition of: Kelly Joplin

In the matter of: Ellis Pollard v DC

Before: US District Court

Date: 09-17-21

Place: teleconference


were duly recorded and accurately transcribed under

my direction; further, that said transcript is a

true and accurate record of the proceedings; and

that I am neither counsel for, related to, nor

employed by any of the parties to this action in

which this deposition was taken; and further that I

am not a relative nor an employee of any of the

parties nor counsel employed by the parties, and I

am not financially or otherwise interested in the

outcome of the action.


------------------------
Court Reporter

# EXHIBIT 13

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**



**ATTORNEY GENERAL**
**KARL A. RACINE**

Civil Litigation Division
Section IV

November 15, 2021

SENT BY ELECTRONIC MAIL

Ellen K. Renaud
Tamara L. Slater
Alan Lescht and Associates, P.C.
1825 K St. NW, Suite 750
Washington, D.C. 20006
tamara.slater@leschtlaw.com

Re:     *Ellis Pollard v. District of Columbia*, C.A. No. 1:19-cv-3099 (ABJ)

Dear Ms. Renaud,

        We are writing to follow-up on the telephone discussion we had last week about the hooded papr respirator, which can be worn by firemen whose religious beliefs require them to wear beards longer than one-quarter inch.  This religious accommodation is available to all firemen who qualify after reporting to the Department's Equal Employment Opportunity (EEO) officer and completing the necessary paperwork.  Please let us know what Ellis Pollard decides to do and call us if this letter does not answer all your questions.

        Those firemen who are granted the religious accommodation, which permits them to wear beards longer than one-quarter inch, must agree to wear the hooded papr respirator, which excuses them from fit testing, but also prohibits them from donning the self-contained breathing apparatus (SCBA) or any respirators designed for chemical, biological, radiological, nuclear, and high yield explosives (CBRNE) environments.  Because of this restriction, Mr. Pollard may return to operations, but he will not be permitted to assume his previous duties as a technician. His wages will remain the same.

        Sincerely,

        Karl A. Racine
        Attorney General of the District of Columbia

By:     _/s/ John J. Bardo_
        John J. Bardo
        Assistant Attorney General

# EXHIBIT 14

| | |
|---|---|
| **From:** | Downs, Shawn (FEMS) |
| **To:** | Pollard, Ellis Jr. (FEMS); FEMS-Telestaff |
| **Cc:** | Grover, Jon Ii. (FEMS); Robinson, Joseph D. (FEMS); Williams, Dexter (FEMS); Donnelly, John (FEMS); Mauro, Amy (FEMS); Baker, Craig (FEMS); Hawkins, Derron (FEMS); Hanson, James (FEMS); Steen, Gary (FEMS); Mills, Edward III. (FEMS); Chounoune, Rudy (FEMS); Hunter, Kenneth (FEMS) |
| **Subject:** | Tech Ellis Pollard Return To Ops Altered Delivery |
| **Date:** | Tuesday, March 1, 2022 12:47:48 PM |

Good afternoon Tech Ellis Pollard,

You have completed all phases of the Safety Bulletin 12 process, seeking an accommodation to Safety Bulletin 10.

You have also completed all phases of the RTO program per the TA staff

You are hereby returned to full-duty and placed back at your regular duty assignment on a transport unit only.  Your chain of command has been looped in to this email for their awareness of such.  Your specific accommodation is:

Due to the fact that you are unable to maintain 1/4" of growth, you shall not operate in any capacity that would require the use of Self Contained Breathing Apparatus, an SCBA facepiece (Vision C-5 or AV 3000 HT), or any capacity that would require respiratory protection beyond that which your issued 3M TR 600 Hooded PAPR will provide.

You will receive an official accommodation letter from the Diversity/EEO Counselor in short time.

Please remember that the fit-test process is annual in nature.  Please ensure you carry the correct fit-test cards with you at all times, if applicable.

Telestaff: Please return this member to full duty at their regular duty assignment, effective 3/5/2022.

Respectfully,

Shawn M Downs
Deputy Fire Chief
Risk Management Division
2531 Sherman Ave N.W.
Washington, DC 20001
202-807-9061

# EXHIBIT 15

Respiratory Protection Plan

# District of Columbia Fire and EMS Department
# Respiratory Protection Plan

# Table of Contents

Forward                    Departmental Policy
Chapter    1               Definitions
Chapter    2               Respiratory Protection Program
Chapter    3               Selection of Respirators
Chapter    4               Medical Evaluation
Chapter    5               Fit Testing
Chapter    6               Use of Respirators
Chapter    7               Procedures for IDLH Atmospheres
Chapter    8               Maintenance and Care of Respirators
Chapter    9               Breathing Air Quality and Use
Chapter   10               Identification of Filters, Cartridges, and Canisters
Chapter   11               Training and Information
Chapter   12               Program Evaluations
Chapter   13               Record Keeping
Appendix A                 Fit Testing Procedures
Appendix B-1               User Seal Check Procedures
Appendix B-2               Respirator Cleaning Procedures
Appendix C                 Respirator Medical Evaluation Questionnaire
Appendix D                 Information for Employees Using Respirators
                           When Not Required Under This Respiratory
                           Protection Plan
Appendix E                 Fit Test Standards
Appendix F                 District of Columbia Fire and EMS Department
                           Self Contained Breathing Apparatus Manual

## Forward

# Department Policy

In the control of those occupational diseases caused by breathing air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors; the primary objective shall be to prevent the inhalation of atmospheric contamination. This shall be accomplished as far as feasible by accepted engineering control measures. When effective engineering controls are not feasible, or while they are being instituted, appropriate respirators shall be used pursuant to this section.

The District of Columbia Fire and EMS Department (Department) shall provide respirators when such equipment is necessary to protect the health of the employee. The Department shall provide respirators that are applicable and suitable for the purpose intended. Personnel of the Department are exposed to respiratory hazards during response to emergency and routine situations. These hazards include atmospheres that are immediately dangerous to life and health (IDLH): where there is an immediate threat to life, there is a potential for irreversible adverse health effects, or there is a possibility of impairment to an individual's ability to escape from a dangerous atmosphere. The Department will provide respirators that allow safe operation in IDLH atmospheres. The Department shall be responsible for the establishment and maintenance of a respiratory protection program, which shall include the requirements outlined in Chapter 2 of this Plan.

The regulatory basis for this Respiratory Protection Plan is found under the Code of Federal Regulations (CFR), Title 40, EPA and Title 29, OSHA. The Environmental Protection Agency (EPA) Title 40 CFR 311 and the Occupational Safety and Health Administration Title 29 CFR 1910.120 are identical regulations mandated by Superfund Amendment and Recovery Act (SARA). The reason both OSHA and EPA promulgated these regulations is that OSHA regulations apply only in states with their own OSHA Agencies. EPA regulations apply to all other states. These regulations apply to everyone, including the District of Columbia.

# Chapter 1

# Definitions

The following definitions are terms used in the District of Columbia Fire and EMS Department Respiratory Protection Plan.

<u>Air-purifying respirator</u> means a respirator with an air-purifying filter, cartridge, or canister that removes specific air contaminants by passing ambient air through the air-purifying element.

<u>Atmosphere-supplying respirator</u> means a respirator that supplies the respirator user with breathing air from a source independent of the ambient atmosphere, and includes self-contained breathing apparatus (SCBA) units.

<u>Canister or cartridge</u> means a container with a filter, sorbent, or catalyst, or combination of these items, which removes specific contaminants from the air passed through the container.

<u>Demand respirator</u> means an atmosphere-supplying respirator that admits breathing air to the facepiece only when a negative pressure is created inside the facepiece by inhalation.

<u>Emergency situation</u> means any occurrence such as, but not limited to, equipment failure, rupture of containers, or failure of control equipment that may or does result in an uncontrolled significant release of an airborne contaminant.

<u>Employee</u> is defined as an employee of the Department who is directly controlled by the Department, as contrasted to an independent contractor.

<u>Employee exposure</u> means exposure to a concentration of an airborne contaminant that would occur if the employee were not using respiratory protection.

<u>End-of-service-life indicator (ESLI)</u> means a system that warns the respirator user of the approach of the end of adequate respiratory protection, for example, that the sorbent is approaching saturation or is no longer effective.

<u>Escape-only respirator</u> means a respirator intended to be used only for emergency exit.

<u>Filter or air purifying element</u> means a component used in respirators to remove solid or liquid aerosols from the inspired air.

<u>Filtering facepiece (dust mask)</u> means a negative pressure particulate respirator with a filter as an integral part of the facepiece or with the entire facepiece composed of the filtering medium.

<u>Fit factor</u> means a quantitative or qualitative estimate of the fit of a particular respirator to a specific individual, and typically estimates the ratio of the concentration of a substance in ambient air to its concentration inside the respirator when worn.

<u>Fit test</u> means the use of a protocol to qualitatively or quantitatively evaluate the fit of a respirator on an individual.

<u>High efficiency particulate air (HEPA) filter</u> means a filter that is at least 99.97% efficient in removing monodisperse particles of 0.3 micrometers in diameter. The equivalent NIOSH 42 CFR 84 particulate filters are the N100, R100, and P100 filters.

<u>Immediately dangerous to life or health (IDLH)</u> means an atmosphere that poses an immediate threat to life, would cause irreversible adverse health effects, or would impair an individual's ability to escape from a dangerous atmosphere.

<u>Interior structural firefighting</u> means the physical activity of fire suppression, rescue, or both, inside of buildings or enclosed structures that are involved in a fire situation beyond the incipient stage.

<u>Loose-fitting facepiece</u> means a respiratory inlet covering that is designed to form a partial seal with the face.

Negative pressure respirator (tight fitting) means a respirator in which the air pressure inside the facepiece is negative during inhalation with respect to the ambient air pressure outside the respirator.

Oxygen deficient atmosphere means an atmosphere with oxygen content below 19.5% by volume.

Physician or other licensed health care professional (PLHCP) means an individual whose legally permitted scope of practice (i.e., license, registration, or certification) allows him or her to independently provide, or be delegated the responsibility to provide, some or all of the health care services required by paragraph (e) of this section.

Positive pressure respirator means a respirator in which the pressure inside the respiratory inlet covering exceeds the ambient air pressure outside the respirator.

Powered air-purifying respirator (PAPR) means an air purifying respirator that uses a blower to force the ambient air through air-purifying elements to the inlet covering.

Pressure demand respirator means a positive pressure atmosphere-supplying respirator that admits breathing air to the facepiece when the positive pressure is reduced inside the facepiece by inhalation.

Qualitative fit test (QLFT) means a pass/fail fit test to assess the adequacy of respirator fit that relies on the individual's response to the test agent.

Quantitative fit test (QNFT) means an assessment of the adequacy of respirator fit by numerically measuring the amount of leakage into the respirator.

Respiratory inlet covering means that portion of a respirator that forms the protective barrier between the user's respiratory tract and an air-purifying device or breathing air source, or both in the form of a facepiece.

Self-contained breathing apparatus (SCBA) means an atmosphere-supplying respirator for which the breathing air source is designed to be carried by the user.

Service life means the period of time that a respirator, filter or sorbent, or other respiratory equipment provides adequate protection to the wearer.

Supplied-air respirator (SAR) or air-line respirator means an atmosphere-supplying respirator for which the source of breathing air is not designed to be carried by the user.

Tight-fitting facepiece means a respiratory inlet covering that forms a complete seal with the face. Examples: the Scott AV-2000, AV-3000 facepiece or N-95 respirator.

User seal check means an action conducted by the respirator user to determine if the respirator is properly seated to the face.

# Chapter 2

# Respiratory Protection Program

The District of Columbia Fire and EMS Department has developed and will implement a written respiratory protection program with required worksite-specific procedures and elements for required respirator use. The program will be administered by a suitably trained program administrator.

The respiratory protection program shall be updated as necessary to reflect those changes in workplace conditions that affect respirator use. The Department shall include in the program the following provisions of this section, as applicable:

1. Procedures for selecting respirators for use;
2. Medical evaluations of employees required to use respirators;
3. Fit testing procedures for tight-fitting respirators;
4. Procedures for proper use of respirators in routine and reasonably foreseeable emergency situations;
5. Procedures and schedules for cleaning, disinfecting, storing, inspecting, repairing, discarding, and otherwise maintaining respirators;
6. Procedures to ensure adequate air quality, quantity, and flow of breathing air for atmosphere-supplying respirators;
7. Training of employees in the respiratory hazards to which they are potentially exposed during routine and emergency situations;
8. Training of employees in the proper use of respirators, including putting on and removing them, any limitations on their use, and their maintenance;
9. Procedures for regularly evaluating the effectiveness of the program.

# Chapter 3

# Selection of Respirators

The Department shall evaluate respiratory hazard(s) in the workplace, identify relevant workplace and user factors, and base respirator selection on these factors. This section also specifies appropriately protective respirators for use in IDLH atmospheres, and limits the selection and use of air-purifying respirators.

*1. General requirements.*

   A. The Department shall select and provide an appropriate respirator based on the respiratory hazard(s) to which the employee is or may be exposed, and workplace and user factors that affect respirator performance and reliability.
   B. The Department shall select a NIOSH-certified respirator. The respirator shall be used in compliance with the conditions of its certification.
   C. The Department shall identify and evaluate the respiratory hazard(s) in the workplace; this evaluation shall include a reasonable estimate of employee exposures to respiratory hazard(s) and an identification of the contaminant's chemical state and physical form.
   D. Where the Department cannot identify or reasonably estimate the employee exposure, the employer shall consider the atmosphere to be IDLH.
   E. The Department shall select respirators from a sufficient number of respirator models and sizes so that the respirator is acceptable to, and correctly fits, the user.

*2. Respirators for IDLH atmospheres.*

The Department shall provide the following respirators for employee use in IDLH atmospheres:

A. A full facepiece positive pressure self-contained breathing apparatus (SCBA) certified by NIOSH for a minimum service life of sixty minutes, or

B. A combination full facepiece pressure demand supplied-air respirator (SAR) with auxiliary self-contained air supply.

All oxygen-deficient atmospheres shall be considered IDLH.

*3. Respirators for atmospheres that are not IDLH.*

The Department shall provide a respirator that is adequate to protect the health of the employee and ensure compliance with all other OSHA statutory and regulatory requirements, under routine and reasonably foreseeable emergency situations. The respirator selected shall be appropriate for the chemical state and physical form of the contaminant.

A. For protection against **gases and vapors**, the Department shall provide:

1. An atmosphere-supplying respirator (SCBA), or
2. An air-purifying respirator provided that:

a. The respirator is equipped with an end-of-service-life indicator (ESLI) certified by NIOSH for the contaminant; or

b. If there is no ESLI appropriate for conditions in the Department's workplace, the Department will follow the manufacturer's recommendation for canister and cartridge change schedule.

B. For protection against **particulates**, the employer shall provide:

1. An atmosphere-supplying respirator (SCBA), or
2. An air-purifying respirator equipped with a filter certified by NIOSH under 30 CFR part 11 as a high efficiency particulate air (HEPA) filter, or an air-purifying respirator equipped with a filter certified for particulates by NIOSH under 42 CFR part 84; or
3. For contaminants consisting primarily of particles with mass median aerodynamic diameters (MMAD) of at least 2

micrometers, an air-purifying respirator equipped with any filter certified for particulates by NIOSH.

# Chapter 4

# Medical Evaluation

Using a respirator may place a physiological burden on employees that varies with the type of respirator worn, the job and workplace conditions in which the respirator is used, and the medical status of the employee. Accordingly, this chapter specifies the minimum requirements for medical evaluation that the Department shall implement to determine the employee's ability to use a respirator.

*1. General.* The Department shall provide a medical evaluation to determine the employee's ability to use a respirator, before the employee is fit tested or required to use the respirator in the workplace.

*2. Medical evaluation procedures.* The Department shall identify a physician or other licensed health care professional (PLHCP) to perform medical evaluations using a medical questionnaire or an initial medical examination that obtains the same information as the medical questionnaire.

The medical evaluation shall obtain the information requested by the questionnaire in Sections 1 and 2, Part A of Appendix C of this section.

*3. Follow-up medical examination.* The Department shall provide a follow-up medical examination for an employee who gives a positive response to any question among questions 1 through 8 in Section 2, Part A of Appendix C or whose initial medical examination demonstrates the need for a follow-up medical examination.

The follow-up medical examination shall include any medical tests, consultations, or diagnostic procedures that the PLHCP deems necessary to make a final determination.

*4. Administration of the medical questionnaire and examinations.* The medical questionnaire and examinations shall be administered confidentially during the employee's normal working hours or at a time and place mutually convenient to the employee and the Department. The medical questionnaire

shall be administered in a manner that ensures that the employee understands its content.

The Department shall provide the employee with an opportunity to discuss the questionnaire and examination results with the PLHCP.

*5. Supplemental information for the PLHCP.* The following information must be provided to the PLHCP before the PLHCP makes a recommendation concerning an employee's ability to use a respirator:

> A. The type and weight of the respirator to be used by the employee;
> B. The duration and frequency of respirator use (including use for rescue and escape);
> C. The expected physical work effort;
> D. Additional protective clothing and equipment to be worn;
> E. Temperature and humidity extremes that may be encountered.

Any supplemental information provided previously to the PLHCP regarding an employee need not be provided for a subsequent medical evaluation if the information and the PLHCP remain the same.

The Department shall provide the PLHCP* with a copy of the written respiratory protection program and a copy of this section.

> * Note to above Paragraph: When the Department replaces a PLHCP, the Department must ensure that the new PLHCP obtains this information, either by providing the documents directly to the PLHCP or having the documents transferred from the former PLHCP to the new PLHCP. However, the Department does not expect to have employees medically reevaluated solely because a new PLHCP has been selected.

*6. Medical determination.* In determining the employee's ability to use a respirator, the Department shall:

Obtain a written recommendation regarding the employee's ability to use the respirator from the PLHCP. The recommendation shall provide only the following information:

A. Any limitations on respirator use related to the medical condition of the employee, or relating to the workplace conditions in which the respirator will be used, including whether or not the employee is medically able to use the respirator;

B. The need, if any, for follow-up medical evaluations;

C. A statement that the PLHCP has provided the employee with a copy of the PLHCP's written recommendation.

*7. Additional medical evaluations.* At a minimum, the Department shall provide additional medical evaluations that comply with the requirements of this section if:

A. An employee reports medical signs or symptoms that are related to their ability to use a respirator;

B. A PLHCP, supervisor, or the respirator program administrator informs the Department that an employee needs to be reevaluated;

C. Information from the respiratory protection program, including observations made during fit testing and program evaluation, indicates a need for employee reevaluation;

D. A change occurs in workplace conditions (e.g., physical work effort, protective clothing, and temperature) that may result in a substantial increase in the physiological burden placed on an employee.

# Chapter 5

# Fit Testing

Before an employee is required to use any respirator with a negative or positive pressure tight-fitting facepiece, the employee shall be fit tested with the same make, model, style, and size of respirator that will be used. This chapter specifies the kind of fit test allowed, the procedures for conducting it, and how the results of the fit test must be used.

1. Employees using a tight-fitting facepiece respirator shall pass an appropriate quantitative fit test (QNFT) or qualitative fit test (QLFT) as required for the specific respirator used.

2. Employees using a tight-fitting facepiece respirator must be fit tested prior to initial use of the respirator, whenever a different respirator facepiece (size, style, model or make) is used, and at least annually thereafter.

3. The Department shall conduct an additional fit test whenever the employee reports, or the employer, PLHCP, supervisor, or program administrator makes visual observations of, changes in the employee's physical condition that could affect respirator fit. Such conditions include, but are not limited to, facial scarring, dental changes, cosmetic surgery, or an obvious change in body weight.

4. If after passing a QNFT or QLFT the employee subsequently notifies the Department, program administrator, supervisor, or PLHCP that the fit of the respirator is unacceptable, the employee shall be given a reasonable opportunity to select a different respirator facepiece and to be retested.

5. The fit test shall be administered using an OSHA-accepted QNFT or QLFT protocol. The OSHA-accepted QNFT and QLFT protocols and procedures are contained in Appendix A of this section. QLFT may only be used to fit test negative-pressure air-purifying respirators that must achieve a fit factor of 100 or less.

6. Fit test factors will be established by Department regulations, and are contained in Appendix E.

7. Fit testing of tight-fitting atmosphere-supplying respirators shall be accomplished by performing quantitative fit testing in the negative pressure mode, regardless of the mode of operation (negative or positive pressure) that is used for respiratory protection.

8. Quantitative fit testing of these respirators shall be accomplished by modifying the facepiece to allow sampling inside the facepiece in the breathing zone of the user, midway between the nose and mouth. This requirement shall be accomplished by installing a permanent sampling probe by using a sampling adapter designed to temporarily provide a means of sampling air from inside the facepiece.

9. Any modifications to the respirator facepiece for fit testing shall be completely removed, and the facepiece restored to NIOSH-approved configuration, before that facepiece can be used in the workplace.

# Chapter 6

# Use of Respirators

The Department requires the use of respirators in hazardous environments. Department regulations include prohibiting conditions that may result in facepiece seal leakage, preventing employees from removing respirators in hazardous environments, taking actions to ensure continued effective respirator operation throughout the work shift, and establishing procedures for the use of respirators in IDLH atmospheres or in interior structural firefighting situations.

*1. Facepiece seal protection.* The Department shall not permit respirators with tight-fitting facepieces to be worn by employees who have:

   A. Facial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function;
   B. Any condition that interferes with the face-to-facepiece seal or valve function.

If an employee wears corrective glasses or goggles or other personal protective equipment, the employer shall ensure that such equipment is worn in a manner that does not interfere with the seal of the facepiece to the face of the user.

For all tight-fitting respirators, the Department must ensure that employees perform a user seal check each time they put on the respirator using the procedures in Appendix B-1 or procedures recommended by the respirator manufacturer that the Department demonstrates are as effective as those in Appendix B-1 of this section.

*2. Continuing respirator effectiveness.* Appropriate surveillance shall be maintained of work area conditions and degree of employee exposure or stress. When there is a change in work area conditions or degree of employee exposure or stress that may affect respirator effectiveness, the Department shall reevaluate the continued effectiveness of the respirator.

The Department shall ensure that employees leave the respirator use area:

    A. To wash their faces and respirator facepieces as necessary to prevent eye or skin irritation associated with respirator use;

    B. If they detect vapor or gas breakthrough, changes in breathing resistance, or leakage of the facepiece;

    C. To replace the respirator or the filter, cartridge, canister elements or air cylinder.

If the employee detects vapor or gas breakthrough, changes in breathing resistance, or leakage of the facepiece, the Department shall replace or repair the respirator before allowing the employee to return to the work area.

## Company Level Field Test

The sealing surface of the facepiece is defined as any area of the facepiece that comes into contact with the wearer's face when the facepiece is worn correctly. This includes all areas of the sealing gasket, including the chin cup. Beard or stubble that lies between the sealing surface of the facepiece and the wearer's face is prohibited.

Supervisors may apply the following field test to ensure compliance of personnel's facial hair.
- Apply the member's issued, correctly sized facepiece to their face.
- Any facial hair that comes between the sealing surface of the facepiece and the face must be removed to ensure the proper fit of the facepiece.
- No facial hair may protrude from the facepiece through the regulator mounting hole, as it could interfere with valve function.



**Facepiece with nose-cup removed**
**Dark areas indicate sealing surface**
**No personnel shall have any facial hair where the sealing surface of the facepiece contacts the face**

GO-2005-28

# Chapter 7

# Procedures for IDLH Atmospheres

1. For all IDLH atmospheres, the Department shall ensure that:

    A. One employee or, when needed, more than one employee is located outside the IDLH atmosphere;

    B. Visual, voice, or signal line communication is maintained between the employee(s) in the IDLH atmosphere and the employee(s) located outside the IDLH atmosphere;

    C. The employee(s) located outside the IDLH atmosphere are trained and equipped to provide effective emergency rescue;

    D. The Department or designee is notified before the employee(s) located outside the IDLH atmosphere enter the IDLH atmosphere to provide emergency rescue;

    E. The Department or designee authorized to do so by the Department, once notified, provides necessary assistance appropriate to the situation;

    F. Employee(s) located outside the IDLH atmospheres are equipped with:

        1) Positive pressure SCBAs, and

        2) Appropriate retrieval equipment for removing the employee(s) who enter(s) these hazardous atmospheres where retrieval equipment would contribute to the rescue of the employee(s) and would not increase the overall risk resulting from entry.

*2. Procedures for interior structural firefighting.* In addition to the requirements set forth under the paragraph above, in interior structural fires, the Department shall ensure that:

    A. At least two employees enter the IDLH atmosphere and remain in visual or voice contact with one another at all times;

    B. All employees engaged in interior structural firefighting use SCBA;

    C. Rapid Intervention teams stand-by outside the IDLH atmosphere in accordance with the Department's SOGs.

# Chapter 8

# Maintenance and Care of Respirators

The Department shall provide for the cleaning and disinfecting, storage, inspection, and repair of respirators used by employees.

In addition to the requirements of this section, self-contained breathing apparatus shall be inspected daily. Air and oxygen cylinders shall be maintained in a fully charged state and shall be recharged when the pressure falls to 90% of the manufacturer's recommended pressure level. The Department shall determine that the regulator and warning devices function properly.

For respirators maintained for emergency use, the Department shall:

1. Certify the respirator by documenting the date the inspection was performed, the name (or signature) of the person who made the inspection, the findings, required remedial action, and a serial number or other means of identifying the inspected respirator; and

2. Provide this information on a tag or label that is attached to the storage compartment for the respirator, is kept with the respirator, or is included in inspection reports stored as paper or electronic files. This information shall be maintained until replaced following a subsequent certification.

## _Cleaning and disinfecting_

The Department shall provide each respirator user with a respirator that is clean, sanitary, and in good working order. The Department shall ensure that respirators are cleaned and disinfected using the procedures in Appendix B-2 of this section, or procedures recommended by the respirator manufacturer, provided that such procedures are of equivalent effectiveness. The respirators shall be cleaned and disinfected at the following intervals:

1. Respirators issued for the exclusive use of an employee shall be cleaned and disinfected as often as necessary to be maintained in a sanitary condition;
2. Respirators issued to more than one employee shall be cleaned and disinfected before being worn by different individuals;
3. Respirators maintained for emergency use shall be cleaned and disinfected after each use;
4. Respirators used in fit testing and training shall be cleaned and disinfected after each use.

## *Storage*

The employee shall ensure that respirators are stored as follows:

All respirators shall be stored to protect them from damage, contamination, dust, sunlight, extreme temperatures, excessive moisture, and damaging chemicals, and they shall be packed or stored to prevent deformation of the facepiece and exhalation valve.

In addition to the requirements of above paragraph of this section, emergency respirators shall be:

1. Kept accessible to the work area;
2. Stored in compartments or in covers that are clearly marked as containing emergency respirators;
3. Stored in accordance with any applicable manufacturer instructions.

## *Inspection*

The Department shall ensure that respirators are inspected as follows:

1. All respirators used in routine situations shall be inspected daily, before each use, and during cleaning;
2. All respirators maintained for use in emergency situations shall be inspected at least monthly and in accordance with the manufacturer's recommendations, and shall be checked for proper function before and after each use; and
3. Emergency escape-only respirators shall be inspected before being carried into the workplace for use.

The Department shall ensure that respirator inspections include the following:

    1.  A check of respirator function, tightness of connections, and condition of the various parts including, but not limited to, the facepiece, head straps, valves, connecting tube, and cartridges, canisters or filters; and

    2.  A check of elastomeric parts for pliability and signs of deterioration.

## *Repairs*

The Department shall ensure that respirators that fail an inspection or are otherwise found to be defective are removed from service, and are discarded or repaired or adjusted in accordance with the following procedures:

1. Repairs or adjustments to respirators are to be made only by persons appropriately trained to perform such operations and shall use only the respirator manufacturer's NIOSH-approved parts designed for the respirator;
2. Repairs shall be made according to the manufacturer's recommendations and specifications for the type and extent of repairs to be performed;
3. Reducing and admission valves, regulators, and alarms shall be adjusted or repaired only by the manufacturer or a technician trained by the manufacturer.

# Chapter 9

# Breathing Air Quality and Use

The Department is required to provide employees using SCBA with breathing gases of high purity.

The Department shall ensure that compressed air and compressed oxygen used for respiration accords with the following specifications:

1. Compressed gasses shall meet the United States Pharmacopoeia requirements for medical or breathing oxygen;
2. Compressed breathing air shall meet at least the requirements for Grade D breathing air described in ANSI/Compressed Gas Association Commodity Specification for Air, G-7.1-1989, to include:
   a. Oxygen content (v/v) of 19.5-23.5%;
   b. Hydrocarbon (condensed) content of 5 milligrams per cubic meter of air or less;
   c. Carbon monoxide (CO) content of 10 ppm or less;
   d. Carbon dioxide content of 1,000 ppm or less; and
   e. Lack of noticeable odor.

The Department shall ensure that compressed oxygen is not used in atmosphere-supplying respirators that have previously used compressed air.

The Department shall ensure that oxygen concentrations greater than 23.5% are used only in equipment designed for oxygen service or distribution.

The Department shall ensure that cylinders used to supply breathing air to respirators meet the following requirements:

1. Cylinders are tested and maintained as prescribed in the Shipping Container Specification Regulations of the Department of Transportation (49 CFR part 173 and part 178);
2. Cylinders of purchased breathing air have a certificate of analysis from the supplier that the breathing air meets the requirements for Grade D breathing air;

3. The moisture content in the cylinder does not exceed a dew point of -50 deg. F (-45.6 deg. C) at 1 atmosphere pressure.

The Department shall ensure that compressors used to supply breathing air to respirators are constructed and situated so as to:

1. Prevent entry of contaminated air into the air-supply system;
2. Minimize moisture content so that the dew point at 1 atmosphere pressure is 10 degrees F (5.56 deg. C) below the ambient temperature;
3. Have suitable in-line air-purifying sorbent beds and filters to further ensure breathing air quality. Sorbent beds and filters shall be maintained and replaced or refurbished periodically following the manufacturer's instructions.
4. Have a tag containing the most recent change date and the signature of the person authorized by the employer to perform the change. The tag shall be maintained at the compressor.
5. For compressors that are not oil-lubricated, the employer shall ensure that carbon monoxide levels in the breathing air do not exceed 10 ppm.
6. For oil-lubricated compressors, the employer shall use a high-temperature or carbon monoxide alarm, or both, to monitor carbon monoxide levels. If only high-temperature alarms are used, the air supply shall be monitored at intervals sufficient to prevent carbon monoxide in the breathing air from exceeding 10 ppm.

The Department shall ensure that breathing air couplings are incompatible with outlets for nonrespirable worksite air or other gas systems. No asphyxiating substance shall be introduced into breathing air lines.

The Department shall use breathing gas containers marked in accordance with the NIOSH respirator certification standard, 42 CFR part 84.

# Chapter 10

# Identification of Filters, Cartridges, and Canisters

The Department shall ensure that all filters, cartridges and canisters used in the workplace are labeled and color-coded with the NIOSH approval label and that the label is not removed and remains legible.

# Chapter 11

# Training and Information

The Department shall provide effective training to employees who are required to use respirators. The training shall be comprehensive, understandable, and recur annually and more often if necessary. The Department shall provide the basic information on respirators in Appendix D of this section to employees who wear respirators when not required by this section or by the Department to do so.

The training shall be conducted in a manner that is understandable to the employee.

The Department shall provide the training prior to requiring the employee to use a respirator in the workplace.

The Department shall ensure that each employee can demonstrate knowledge of at least the following:

1. Why the respirator is necessary and how improper fit, usage, or maintenance can compromise the protective effect of the respirator;
2. What the limitations and capabilities of the respirator are;
3. How to use the respirator effectively in emergency situations, including situations in which the respirator malfunctions;
4. How to inspect, put on and remove, use, and check the seals of the respirator;
5. What the procedures are for maintenance and storage of the respirator;
6. How to recognize medical signs and symptoms that may limit or prevent the effective use of respirators;
7. The general requirements of this section.

When the Department is able to demonstrate that a new employee has received training within the last 12 months that addresses the elements specified in the previous paragraph the employee is not required to repeat

such training provided that the employee can demonstrate knowledge of those element(s). Previous training not repeated initially by the Department must be provided no later than 12 months from the date of the previous training.

Retraining shall be administered annually, and when the following situations occur:

1. Changes in the workplace or the type of respirator render previous training obsolete;
2. Inadequacies in the employee's knowledge or use of the respirator indicate that the employee has not retained the requisite understanding or skill; or,
3. Any other situation arises in which retraining appears necessary to ensure safe respirator use.

The basic advisory information on respirators, as presented in Appendix D of this section, shall be provided by the Department in any written or oral format, to employees who wear respirators when such use is not required by this section or by the Department.

# Chapter 12

# Program Evaluation

The Department shall conduct evaluations of the workplace to ensure that the written respiratory protection program is being properly implemented, and to consult employees to ensure that they are using the respirators properly.

The Department shall conduct evaluations of the workplace as necessary to ensure that the provisions of the current written program are being effectively implemented and that it continues to be effective.

The Department shall regularly consult employees required to use respirators to assess the employees' views on program effectiveness and to identify any problems. Any problems that are identified during this assessment shall be corrected. Factors to be assessed include, but are not limited to:

    a. Respirator fit (including the ability to use the respirator without interfering with effective workplace performance);
    b. Appropriate respirator selection for the hazards to which the employee is exposed;
    c. Proper respirator use under the workplace conditions the employee encounters;
    d. Proper respirator maintenance.

# Chapter 13

# Record Keeping

The Department shall establish and retain written information regarding medical evaluations, fit testing, and the respirator program. This information will facilitate employee involvement in the respirator program, assist the Department in auditing the adequacy of the program, and provide a record for compliance.

*1. Medical evaluation.* Records of medical evaluations required by this section shall be retained and made available in accordance with 29 CFR 1910.1020.

*2. Fit Testing.* The Department shall establish a record of the quantitative fit tests (QNFT) and qualitative fit tests (QLFT) administered to an employee including:

1. The name or identification of the employee tested;
2. Type of fit test performed;
3. Specific make, model, style, and size of respirator tested;
4. Date of test;
5. The pass / fail results for recording of the test results.

Fit test records shall be retained for respirator users until the next fit test is administered. The Department shall retain a written copy of the current respirator program. Written materials required to be retained under this paragraph shall be made available upon request to affected employees and to the Program Administrator for examination and copying.

# Appendices

Compliance with Appendix A, Appendix B-1, Appendix B-2, and Appendix C of this Respiratory Protection Plan is mandatory.

Appendix A: Fit Test Procedures

Appendix B-1: User Seal Check Procedures

Appendix B-2: Respirator Cleaning Procedures

Appendix C: Respirator Medical Evaluation Questionnaire

Appendix D: Information for Employees Using Respirators When Not
        Required Under This Respiratory Protection Plan

Appendix E: Fit Test Standards

Appendix F: The District of Columbia Fire and EMS Department Self
        Contained Breathing Apparatus Manual.
        (This section is non-mandatory and is not intended to create any
        additional obligations not otherwise imposed or to detract from any
        existing obligations.)

# Appendix A

# Fit Test Procedures

(A): Fit Testing Procedures--General Requirements

The Department shall conduct fit testing using the following procedures. The requirements in this appendix apply to all OSHA-accepted fit test methods for the Qualitative Fit Test (QLFT) and the Quantitative Fit Test (QNFT).

1) The test subject shall be allowed to pick the most acceptable respirator from a sufficient number of respirator models and sizes so that the respirator is acceptable to, and correctly fits, the user.

2) Prior to the selection process, the test subject shall be shown how to put on a respirator, how it should be positioned on the face, how to set strap tension and how to determine an acceptable fit. A mirror shall be available to assist the subject in evaluating the fit and positioning of the respirator. This instruction may not constitute the subject's formal training on respirator use, because it is only a review.

3) The test subject shall be informed that he or she is being asked to select the respirator that provides the most acceptable fit. Each respirator represents a different size and shape, and if fitted and used properly, will provide adequate protection.

4) The test subject shall be instructed to hold each chosen facepiece up to the face and eliminate those that obviously do not give an acceptable fit.

5) The more acceptable facepieces are noted in case the one selected proves unacceptable; the most comfortable mask is donned and worn at least five minutes to assess comfort. Assistance in assessing comfort can be given by discussing the points in the following item A.6. If the test subject is not familiar with using a particular respirator, the test subject shall be directed to don the mask several times and to adjust the straps each time to become adept at setting proper tension on the straps.

6) Assessment of comfort shall include a review of the following points with the test subject and allowing the test subject adequate time to determine the comfort of the respirator:

   a) Position of the mask on the nose.
   b) Room for eye protection.
   c) Room to talk.
   d) Position of mask on face and cheeks.

7) The following criteria shall be used to help determine the adequacy of the respirator fit:

   a) Chin properly placed.
   b) Adequate strap tension, not overly tightened.

1

Respiratory Protection Plan                Appendix A                          11/29/12

    c)  Fit across nose bridge.
    d)  Respirator of proper size to span distance from nose to chin.
    e)  Tendency of respirator to slip.
    f)  Self-observation in mirror to evaluate fit and respirator position.

8) The test subject shall conduct a user seal check, either the negative and positive pressure seal checks described in Appendix B-1 of this section or those recommended by the respirator manufacturer which provide equivalent protection to the procedures in Appendix B-1. Before conducting the negative and positive pressure checks, the subject shall be told to seat the mask on the face by moving the head from side-to-side and up and down slowly while taking in a few slow deep breaths. Another facepiece shall be selected and retested if the test subject fails the user seal check tests.

9) The test shall not be conducted if there is any hair growth between the skin and the facepiece sealing surface, such as stubble beard growth, beard, mustache or sideburns which cross the respirator sealing surface. Any type of apparel that interferes with a satisfactory fit shall be altered or removed.

10) If a test subject exhibits difficulty in breathing during the tests, she or he shall be referred to a physician or other licensed health care professional, as appropriate, to determine whether the test subject can wear a respirator while performing her or his duties.

11) If the employee finds the fit of the respirator unacceptable, the test subject shall be given the opportunity to select a different respirator and to be retested.

12) Exercise regimen. Prior to the commencement of the fit test, the test subject shall be given a description of the fit test and the test subject's responsibilities during the test procedure. The description of the process shall include a description of the test exercises that the subject will be performing. The respirator to be tested shall be worn for at least 5 minutes before the start of the fit test.

13) The fit test shall be performed while the test subject is wearing any applicable safety equipment that may be worn during actual respirator use which could interfere with respirator fit.

14) Test Exercise - Controlled Negative Pressure (CNP) REDON quantitative fit testing protocol

(a) The CNP protocol provides an alternative to aerosol fit test methods. The CNP fit test method technology is based on exhausting air from a temporarily sealed respirator facepiece to generate and then maintain a constant negative pressure inside the facepiece.

    The rate of air exhaust is controlled so that a constant negative pressure is maintained in the respirator during the fit test. The level of pressure is selected to replicate the mean inspiratory pressure that causes leakage into the respirator under normal use conditions. With pressure held constant, air flow out of the respirator is equal to air flow into the respirator. Therefore, measurement of the exhaust stream that is required to hold the pressure in the temporarily sealed respirator constant yields a direct measure of leakage air

2

flow into the respirator. The CNP fit test method measures leak rates through the facepiece as a method for determining the facepiece fit for negative pressure respirators.

To perform the test, the test subject closes his or her mouth and holds his/her breath, after which an air pump removes air from the respirator facepiece at a pre-selected constant pressure. The facepiece fit is expressed as the leak rate through the facepiece, expressed as milliliters per minute. The quality and validity of the CNP fit tests are determined by the degree to which the in-mask pressure tracks the test pressure during the system measurement time of approximately five seconds. Instantaneous feedback in the form of a real-time pressure trace of the in-mask pressure is provided and used to determine test validity and quality.

A minimum fit factor pass level of 100 is necessary for a half-mask respirator and a minimum fit factor of at least 500 is required for a full facepiece respirator. The entire screening and testing procedure shall be explained to the test subject prior to the conduct of the screening test.

(b) CNP Fit Test Requirements:

1) The instrument shall have a non-adjustable test pressure of 15.0 mm water pressure.

2) The CNP system defaults selected for test pressure shall be set at -15 mm of water (-0.58 inches of water) and the modeled inspiratory flow rate shall be 53.8 liters per minute for performing fit tests.

Note: CNP systems have built-in capability to conduct fit testing that is specific to unique work rate, mask, and gender situations that might apply in a specific workplace. Use of system default values, which were selected to represent respirator wear with medium cartridge resistance at a low-moderate work rate, will allow inter-test comparison of the respirator fit.)

3) The individual who conducts the CNP fit testing shall be thoroughly trained to perform the test.

4) The respirator filter or cartridge needs to be replaced with the CNP test manifold. The inhalation valve downstream from the manifold either needs to be temporarily removed or propped open.

5) The test subject shall be trained to hold his or her breath for at least 20 seconds.

6) The test subject shall don the test respirator without any assistance from the individual who conducts the CNP fit test.

7) The QNFT protocol shall be followed according to section I. C. 1. of this appendix with an exception for the CNP test exercises.

3

Respiratory Protection Plan          Appendix A                    11/29/12

8) CNP Test Exercises

   a) On September 4, 2004, the REDON Protocol was written into the Federal Register,
      1910.134, Appendix A. This ruling may be found on OSHA's website, www.osha.gov.
      Search for "1910.134 Appendix A."

   b) With the OHD Quantifit Controlled Negative Pressure (CNP) technology, an entire
      respirator fit test can be performed in as little as two to three minutes.

   c) While the protocol has been shortened to meet the strengths of CNP, studies show that
      the REDON protocol actually yields a more conservative result compared to that of the
      previous OSHA protocol.

   d) The test protocol requires three separate donnings (re-dons), which is one of the most
      critical steps in wearing a respirator. The multiple donnings can be very educational in
      implementing proper use and fit of a respirator.

   e) Employers must ensure that each test subject being fit tested using this protocol
      follows the exercise and measurement procedures, including the order of
      administration, described below in Table A-1 of this appendix.

### Table A-1.  CNP REDON Quantitative Fit Testing Protocol

| Exercises[1] | Exercise procedure | Measurement procedure |
|---|---|---|
| Facing Forward | Stand and breathe normally, without talking, for 30 seconds. | Face forward, while holding breath for 10 seconds. |
| Bending Over | Bend at the waist, as if going to touch his or her toes, for 30 seconds. | Face parallel to the floor, while holding breath for 10 seconds |
| Head Shaking | For about three seconds, shake head back and forth vigorously several times while shouting. | Face forward, while holding breath for 10 seconds. |
| REDON 1 | Remove the respirator mask, loosen all facepiece straps, and then redon the respirator mask. | Face forward, while holding breath for 10 seconds. |
| REDON 2 | Remove the respirator mask, loosen all facepiece straps, and then redon the respirator mask again. | Face forward, while holding breath for 10 seconds. |

[1] Exercises are listed in the order in which they are to be administered.

D.C. 2019-cv-03099 (ABJ) - 000165

Respiratory Protection Plan          Appendix A                    11/29/12

(f)  After completing the test exercises, the test administrator must question each test
     subject regarding the comfort of the respirator. When a test subject states that the
     respirator is unacceptable, the employer must ensure that the test administrator repeats
     the protocol using another respirator model.

(g)  Employers must determine the overall fit factor for each test subject by calculating the
     harmonic mean of the fit testing exercises as follows:

$$\text{Overall Fit Factor} = \frac{N}{\left[ 1/FF_1 + 1/FF_2 + \ldots\; 1/FF_N \right]}$$

     Where:
     N = The number of exercises;
     FF1 = The fit factor for the first exercise;
     FF2 = The fit factor for the second exercise; and
     FFN = The fit factor for the nth exercise.

(h) CNP Test Instrument:

     1)  The test instrument shall have an effective audio warning device when the test
         subject fails to hold his or her breath during the test. The test shall be terminated
         whenever the test subject failed to hold his or her breath. The test subject may be
         refitted and retested.

     2)  A record of the test shall be kept on file, assuming the fit test was successful. The
         record must contain the test subject's name; overall fit factor; make, model, style
         and size of respirator used; and date tested.

(B)  Qualitative Fit Test (QLFT) Protocols

     1. General

         a.  Persons administering QLFT shall prepare test solutions, calibrate equipment,
             perform tests properly, recognize invalid tests, and ensure that test equipment is in
             proper working order.

         b.  QLFT equipment shall be kept clean and well maintained so as to operate within the
             parameters for which it was designed.

     2. Isoamyl Acetate Protocol

         **Note:** This protocol is not appropriate to use for the fit testing of particulate respirators.
         If used to fit test particulate respirators, the respirator must be equipped with an organic
         vapor filter.

5

Respiratory Protection Plan          Appendix A                    11/29/12

a. Odor Threshold Screening.

Odor threshold screening, performed without wearing a respirator, is intended to determine if the individual tested can detect the odor of isoamyl acetate at low levels.

(1) Three 1 liter glass jars with metal lids are required.

(2) Odor-free water (e.g., distilled or spring water) at approximately 25 <deg>C (77 <deg>F) shall be used for the solutions.

(3) The isoamyl acetate (IAA) (also known at isopentyl acetate) stock solution is prepared by adding 1 ml of pure IAA to 800 ml of odor-free water in a 1 liter jar, closing the lid and shaking for 30 seconds. A new solution shall be prepared at least weekly.

(4) The screening test shall be conducted in a room separate from the room used for actual fit testing. The two rooms shall be well-ventilated to prevent the odor of IAA from becoming evident in the general room air where testing takes place.

(5) The odor test solution is prepared in a second jar by placing 0.4 ml of the stock solution into 500 ml of odor-free water using a clean dropper or pipette. The solution shall be shaken for 30 seconds and allowed to stand for two to three minutes so that the IAA concentration above the liquid may reach equilibrium. This solution shall be used for only one day.

(6) A test blank shall be prepared in a third jar by adding 500 cc of odor-free water.

(7) The odor test and test blank jar lids shall be labeled (e.g., 1 and 2) for jar identification. Labels shall be placed on the lids so that they can be peeled off periodically and switched to maintain the integrity of the test.

(8) The following instruction shall be typed on a card and placed on the table in front of the two test jars (i.e., 1 and 2): ``The purpose of this test is to determine if you can smell banana oil at a low concentration. The two bottles in front of you contain water. One of these bottles also contains a small amount of banana oil. Be sure the covers are on tight, then shake each bottle for two seconds. Unscrew the lid of each bottle, one at a time, and sniff at the mouth of the bottle. Indicate to the test conductor which bottle contains banana oil.

(9) The mixtures used in the IAA odor detection test shall be prepared in an area separate from where the test is performed, in order to prevent olfactory fatigue in the subject.

(10) If the test subject is unable to correctly identify the jar containing the odor test solution, the IAA qualitative fit test shall not be performed.

(11) If the test subject correctly identifies the jar containing the odor test solution, the test subject may proceed to respirator selection and fit testing.

6

Respiratory Protection Plan          Appendix A                    11/29/12

(b) Isoamyl Acetate Fit Test

    (1) The fit test chamber shall be a clear 55-gallon drum liner suspended inverted over a 2-foot diameter frame so that the top of the chamber is about 6 inches above the test subject's head. If no drum liner is available, a similar chamber shall be constructed using plastic sheeting. The inside top center of the chamber shall have a small hook attached.

    (2) Each respirator used for the fitting and fit testing shall be equipped with organic vapor cartridges or offer protection against organic vapors.

    (3) After selecting, donning, and properly adjusting a respirator, the test subject shall wear it to the fit testing room. This room shall be separate from the room used for odor threshold screening and respirator selection, and shall be well-ventilated, as by an exhaust fan or lab hood, to prevent general room contamination.

    (4) A copy of the test exercises and any prepared text from which the subject is to read shall be taped to the inside of the test chamber.

    (5) Upon entering the test chamber, the test subject shall be given a 6-inch by 5-inch piece of paper towel, or other porous, absorbent, single-ply material, folded in half and wetted with 0.75 ml of pure IAA. The test subject shall hang the wet towel on the hook at the top of the chamber. An IAA test swab or ampule may be substituted for the IAA wetted paper towel provided it has been demonstrated that the alternative IAA source will generate an IAA test atmosphere with a concentration equivalent to that generated by the paper towel method.

    (6) Allow two minutes for the IAA test concentration to stabilize before starting the fit test exercises. This would be an appropriate time to talk with the test subject to explain the fit test, the importance of his/her cooperation, and the purpose for the test exercises; or to demonstrate some of the exercises.

    (7) If at any time during the test, the subject detects the banana-like odor of IAA, the test is failed. The subject shall quickly exit from the test chamber and leave the test area to avoid olfactory fatigue.

    (8) If the test is failed, the subject shall return to the selection room and remove the respirator. The test subject shall repeat the odor sensitivity test, select and put on another respirator, return to the test area and again begin the fit test procedure described in (b) (1) through (7) above. The process continues until a respirator that fits well has been found. Should the odor sensitivity test be failed, the subject shall wait at least 5 minutes before retesting. Odor sensitivity will usually have returned by this time.

D.C. 2019-cv-03099 (ABJ) - 000168

Respiratory Protection Plan            Appendix A                    11/29/12

(9) If the subject passes the test, the efficiency of the test procedure shall be demonstrated by having the subject break the respirator face seal and take a breath before exiting the chamber.

(10) When the test subject leaves the chamber, the subject shall remove the saturated towel and return it to the person conducting the test, so that there is no significant IAA concentration buildup in the chamber during subsequent tests. The used towels shall be kept in a self-sealing plastic bag to keep the test area from being contaminated.

3.  Saccharin Solution Aerosol Protocol

The entire screening and testing procedure shall be explained to the test subject prior to the conduct of the screening test.

a.  Taste threshold screening. The saccharin taste threshold screening, performed without wearing a respirator, is intended to determine whether the individual being tested can detect the taste of saccharin.

1)  During threshold screening as well as during fit testing, subjects shall wear an enclosure about the head and shoulders that is approximately 12 inches in diameter by 14 inches tall with at least the front portion clear and that allows free movements of the head when a respirator is worn. An enclosure substantially similar to the 3M hood assembly, parts # FT 14 and # FT 15 combined, is adequate.

2)  The test enclosure shall have a 3/4-inch (1.9 cm) hole in front of the test subject's nose and mouth area to accommodate the nebulizer nozzle.

3)  The test subject shall don the test enclosure. Throughout the threshold screening test, the test subject shall breathe through his or her slightly open mouth with tongue extended. The subject is instructed to report when he or she detects a sweet taste.

4)  Using a DeVilbiss Model 40 Inhalation Medication Nebulizer or equivalent, the test conductor shall spray the threshold check solution into the enclosure. The nozzle is directed away from the nose and mouth of the person. This nebulizer shall be clearly marked to distinguish it from the fit test solution nebulizer.

5)  The threshold check solution is prepared by dissolving 0.83 grams of sodium saccharin USP in 100 ml of warm water. It can be prepared by putting 1 ml of the fit test solution (see (b)(5) below) in 100 ml of distilled water.

6)  To produce the aerosol, the nebulizer bulb is firmly squeezed so that it collapses completely, then released and allowed to fully expand.

8

Respiratory Protection Plan          Appendix A                    11/29/12

7) Ten squeezes are repeated rapidly and then the test subject is asked whether the saccharin can be tasted. If the test subject reports tasting the sweet taste during the ten squeezes, the screening test is completed. The taste threshold is noted as ten regardless of the number of squeezes actually completed.

8) If the first response is negative, ten more squeezes are repeated rapidly and the test subject is again asked whether the saccharin is tasted. If the test subject reports tasting the sweet taste during the second ten squeezes, the screening test is completed. The taste threshold is noted as twenty regardless of the number of squeezes actually completed.

9) If the second response is negative, ten more squeezes are repeated rapidly and the test subject is again asked whether the saccharin is tasted. If the test subject reports tasting the sweet taste during the third set of ten squeezes, the screening test is completed. The taste threshold is noted as thirty regardless of the number of squeezes actually completed.

10) The test conductor will take note of the number of squeezes required to solicit a taste response.

11) If the saccharin is not tasted after 30 squeezes (step 10), the test subject is unable to taste saccharin and may not perform the saccharin fit test.

**Note to paragraph 3. (a):** If the test subject eats or drinks something sweet before the screening test, he/she may be unable to taste the weak saccharin solution.

12) If a taste response is elicited, the test subject shall be asked to take note of the taste for reference in the fit test.

13) Correct use of the nebulizer means that approximately 1 ml of liquid is used at a time in the nebulizer body.

14) The nebulizer shall be thoroughly rinsed in water, shaken dry and refilled at least each morning and afternoon or at least every four hours.

(b) Saccharin solution aerosol fit test procedure.

1) The test subject may not eat, drink (except plain water), smoke, or chew gum for 15 minutes before the test.

2) The fit test uses the same enclosure described in 3. (a), above.

3) The test subject shall don the enclosure while wearing the respirator selected in section I. A. of this appendix. The respirator shall be properly adjusted and equipped with a particulate filter(s).

9

4) A second DeVilbiss Model 40 Inhalation Medication Nebulizer or equivalent is used to spray the fit test solution into the enclosure. This nebulizer shall be clearly marked to distinguish it from the screening test solution nebulizer.

5) The fit test solution is prepared by adding 83 grams of sodium saccharin to 100 ml of warm water.

6) As before, the test subject shall breathe through the slightly open mouth with tongue extended, and report if he or she tastes the sweet taste of saccharin.

7) The nebulizer is inserted into the hole in the front of the enclosure and an initial concentration of saccharin fit test solution is sprayed into the enclosure using the same number of squeezes (either 10, 20 or 30 squeezes) based on the number of squeezes required to elicit a taste response as noted during the screening test. A minimum of 10 squeezes is required.

8) After generating the aerosol, the test subject shall be instructed to perform the exercises in section I. A. 14 of this appendix.

9) Every 30 seconds the aerosol concentration shall be replenished using one half the original number of squeezes used initially (e.g., 5, 10 or 15).

10) The test subject shall indicate to the test conductor if at any time during the fit test the taste of saccharin is detected. If the test subject does not report tasting the saccharin, the test is passed.

11) If the taste of saccharin is detected, the fit is deemed unsatisfactory and the test is failed. A different respirator shall be tried and the entire test procedure is repeated (taste threshold screening and fit testing).

12) Since the nebulizer has a tendency to clog during use, the test operator must make periodic checks of the nebulizer to ensure that it is not clogged. If clogging is found at the end of the test session, the test is invalid.

4. Bitrex ™ (Denatonium Benzoate) Solution Aerosol Qualitative Fit Test Protocol

The Bitrex ™ (Denatonium Benzoate) solution aerosol QLFT protocol uses the published saccharin test protocol because that protocol is widely accepted. Bitrex is routinely used as a taste aversion agent in household liquids which children should not be drinking and is endorsed by the American Medical Association, the National Safety Council, and the American Association of Poison Control Centers. The entire screening and testing procedure shall be explained to the test subject prior to the conduct of the screening test.

(a) Taste Threshold Screening.

The Bitrex taste threshold screening, performed without wearing a respirator, is intended to determine whether the individual being tested can detect the taste of Bitrex.

10

Respiratory Protection Plan                    Appendix A                    11/29/12

1) During threshold screening as well as during fit testing, subjects shall wear an enclosure about the head and shoulders that is approximately 12 inches (30.5 cm) in diameter by 14 inches (35.6 cm) tall. The front portion of the enclosure shall be clear from the respirator and allow free movement of the head when a respirator is worn. An enclosure substantially similar to the 3M hood assembly, parts # FT 14 and # FT 15 combined, is adequate.

2) The test enclosure shall have a \3/4\ inch (1.9 cm) hole in front of the test subject's nose and mouth area to accommodate the nebulizer nozzle.

3) The test subject shall don the test enclosure. Throughout the threshold screening test, the test subject shall breathe through his or her slightly open mouth with tongue extended. The subject is instructed to report when he or she detects a bitter taste.

4) Using a DeVilbiss Model 40 Inhalation Medication Nebulizer or equivalent, the test conductor shall spray the Threshold Check Solution into the enclosure. This Nebulizer shall be clearly marked to distinguish it from the fit test solution nebulizer.

5) The Threshold Check Solution is prepared by adding 13.5 milligrams of Bitrex to 100 ml of 5% salt (NaCl) solution in distilled water.

6) To produce the aerosol, the nebulizer bulb is firmly squeezed so that the bulb collapses completely, and is then released and allowed to fully expand.

7) An initial ten squeezes are repeated rapidly and then the test subject is asked whether the Bitrex can be tasted. If the test subject reports tasting the bitter taste during the ten squeezes, the screening test is completed. The taste threshold is noted as ten regardless of the number of squeezes actually completed.

8) If the first response is negative, ten more squeezes are repeated rapidly and the test subject is again asked whether the Bitrex is tasted. If the test subject reports tasting the bitter taste during the second ten squeezes, the screening test is completed. The taste threshold is noted as twenty regardless of the number of squeezes actually completed.

9) If the second response is negative, ten more squeezes are repeated rapidly and the test subject is again asked whether the Bitrex is tasted. If the test subject reports tasting the bitter taste during the third set of ten squeezes, the screening test is completed. The taste threshold is noted as thirty regardless of the number of squeezes actually completed.

10) The test conductor will take note of the number of squeezes required to solicit a taste response.

11) If the Bitrex is not tasted after 30 squeezes (step 10), the test subject is unable to taste Bitrex and may not perform the Bitrex fit test.

12) If a taste response is elicited, the test subject shall be asked to take note of the taste for reference in the fit test.

11

Respiratory Protection Plan          Appendix A                    11/29/12

13) Correct use of the nebulizer means that approximately 1 ml of liquid is used at a time in the nebulizer body.

14) The nebulizer shall be thoroughly rinsed in water, shaken to dry, and refilled at least each morning and afternoon or at least every four hours.

(b) Bitrex Solution Aerosol Fit Test Procedure.

1) The test subject may not eat, drink (except plain water), smoke, or chew gum for 15 minutes before the test.

2) The fit test uses the same enclosure as that described in 4. (a), above.

3) The test subject shall don the enclosure while wearing the respirator selected according to section I. A. of this appendix. The respirator shall be properly adjusted and equipped with any type particulate filter(s).

4) A second DeVilbiss Model 40 Inhalation Medication Nebulizer or equivalent is used to spray the fit test solution into the enclosure. This nebulizer shall be clearly marked to distinguish it from the screening test solution nebulizer.

5) The fit test solution is prepared by adding 337.5 mg of Bitrex to 200 ml of a 5% salt (NaCl) solution in warm water.

6) As before, the test subject shall breathe through his or her slightly open mouth with tongue extended, and be instructed to report if he/she tastes the bitter taste of Bitrex.

7) The nebulizer is inserted into the hole in the front of the enclosure and an initial concentration of the fit test solution is sprayed into the enclosure using the same number of squeezes (either 10, 20 or 30 squeezes) based on the number of squeezes required to elicit a taste response as noted during the screening test.

8) After generating the aerosol, the test subject shall be instructed to perform the exercises in section I. A. 14. of this appendix.

9) Every 30 seconds the aerosol concentration shall be replenished using one half the number of squeezes used initially (e.g., 5, 10 or 15).

10) The test subject shall indicate to the test conductor if at any time during the fit test the taste of Bitrex is detected. If the test subject does not report tasting the Bitrex, the test is passed.

11) If the taste of Bitrex is detected, the fit is deemed unsatisfactory and the test is failed. A different respirator shall be tried and the entire test procedure is repeated (taste threshold screening and fit testing).

12

D.C. 2019-cv-03099 (ABJ) - 000173

Respiratory Protection Plan          Appendix A                    11/29/12

5. Irritant Smoke (Stannic Chloride) Protocol

This qualitative fit test uses a person's response to the irritating chemicals released in the "smoke" produced by a stannic chloride ventilation smoke tube to detect leakage into the respirator.

(a) General Requirements and Precautions

1) The respirator to be tested shall be equipped with high efficiency particulate air (HEPA) or P100 series filter(s).

2) Only stannic chloride smoke tubes shall be used for this protocol.

3) No form of test enclosure or hood for the test subject shall be used.

4) The smoke can be irritating to the eyes, lungs, and nasal passages. The test conductor shall take precautions to minimize the test subject's exposure to irritant smoke. Sensitivity varies, and certain individuals may respond to a greater degree to irritant smoke. Care shall be taken when performing the sensitivity screening checks that determine whether the test subject can detect irritant smoke to use only the minimum amount of smoke necessary to elicit a response from the test subject.

5) The fit test shall be performed in an area with adequate ventilation to prevent exposure of the person conducting the fit test or the build-up of irritant smoke in the general atmosphere.

(b) Sensitivity Screening Check

The person to be tested must demonstrate his or her ability to detect a weak concentration of the irritant smoke.

1) The test operator shall break both ends of a ventilation smoke tube containing stannic chloride, and attach one end of the smoke tube to a low flow air pump set to deliver 200 milliliters per minute, or an aspirator squeeze bulb. The test operator shall cover the other end of the smoke tube with a short piece of tubing to prevent potential injury from the jagged end of the smoke tube.

2) The test operator shall advise the test subject that the smoke can be irritating to the eyes, lungs, and nasal passages and instruct the subject to keep his or her eyes closed while the test is performed.

3) The test subject shall be allowed to smell a weak concentration of the irritant smoke before the respirator is donned to become familiar with its irritating properties and to determine if he or she can detect the irritating properties of the smoke. The test operator shall carefully direct a small amount of the irritant smoke in the test subject's direction to determine that he or she can detect it.

(c) Irritant Smoke Fit Test Procedure

13

D.C. 2019-cv-03099 (ABJ) - 000174

Respiratory Protection Plan                    Appendix A                        11/29/12

1) The person being fit tested shall don the respirator without assistance, and perform the required user seal check(s).

2) The test subject shall be instructed to keep his or her eyes closed.

3) The test operator shall direct the stream of irritant smoke from the smoke tube toward the face seal area of the test subject, using the low flow pump or the squeeze bulb. The test operator shall begin at least 12 inches from the facepiece and move the smoke stream around the whole perimeter of the mask. The operator shall gradually make two more passes around the perimeter of the mask, moving to within six inches of the respirator.

4) If the person being tested has not had an involuntary response and/or detected the irritant smoke, proceed with the test exercises.

5) The exercises identified in section I.A. 14 of this appendix shall be performed by the test subject while the respirator seal is being continually challenged by the smoke, directed around the perimeter of the respirator at a distance of six inches.

6) If the person being fit tested reports detecting the irritant smoke at any time, the test is failed. The person being retested must repeat the entire sensitivity check and fit test procedure.

7) Each test subject passing the irritant smoke test without evidence of a response (involuntary cough, irritation) shall be given a second sensitivity screening check, with the smoke from the same smoke tube used during the fit test, once the respirator has been removed, to determine whether he/she still reacts to the smoke. Failure to evoke a response shall void the fit test.

8) If a response is produced during this second sensitivity check, then the fit test is passed.

C. Quantitative Fit Test (QNFT) Protocols

The following quantitative fit testing procedures have been demonstrated to be acceptable: quantitative fit testing using a non-hazardous test aerosol (such as corn oil, polyethylene glycol 400 [PEG 400], di-2-ethyl hexyl sebacate [DEHS], or sodium chloride) generated in a test chamber, and employing instrumentation to quantify the fit of the respirator; quantitative fit testing using ambient aerosol as the test agent and appropriate instrumentation (condensation nuclei counter) to quantify the respirator fit; quantitative fit testing using controlled negative pressure and appropriate instrumentation to measure the volumetric leak rate of a facepiece to quantify the respirator fit.

14

D.C. 2019-cv-03099 (ABJ) - 000175

Respiratory Protection Plan          Appendix A                    11/29/12

1. General

    (a) The Department shall ensure that persons administering QNFT are able to calibrate equipment and perform tests properly, recognize invalid tests, calculate fit factors properly and ensure that test equipment is in proper working order.

    (b) The Department shall ensure that QNFT equipment is kept clean, and is maintained and calibrated according to the manufacturer's instructions so as to operate at the parameters for which it was designed.

2. Generated Aerosol Quantitative Fit Testing Protocol

(a) Apparatus.

    1) Instrumentation. Aerosol generation, dilution, and measurement systems using particulates (corn oil, polyethylene glycol 400 [PEG 400], di-2-ethyl hexyl sebacate [DEHS] or sodium chloride) as test aerosols shall be used for quantitative fit testing.

    2) Test chamber. The test chamber shall be large enough to permit all test subjects to perform freely all required exercises without disturbing the test agent concentration or the measurement apparatus. The test chamber shall be equipped and constructed so that the test agent is effectively isolated from the ambient air, yet uniform in concentration throughout the chamber.

    3) When testing air-purifying respirators, the normal filter or cartridge element shall be replaced with a high efficiency particulate air (HEPA) or P100 series filter supplied by the same manufacturer.

    4) The sampling instrument shall be selected so that a computer record or strip chart record may be made of the test showing the rise and fall of the test agent concentration with each inspiration and expiration at fit factors of at least 2,000. Integrators or computers that integrate the amount of test agent penetration leakage into the respirator for each exercise may be used provided a record of the readings is made.

    5) The combination of substitute air-purifying elements, test agent and test agent concentration shall be such that the test subject is not exposed in excess of an established exposure limit for the test agent at any time during the testing process, based upon the length of the exposure and the exposure limit duration.

    6) The sampling port on the test specimen respirator shall be placed and constructed so that no leakage occurs around the port (e.g., where the respirator is probed), a free air flow is allowed into the sampling line at all times, and there is no interference with the fit or performance of the respirator. The in-mask sampling device (probe) shall be designed and used so that the air sample is drawn from the breathing zone of the test subject, midway between the nose and mouth and with the probe extending into the facepiece cavity at least 1/4 inch.

15

Respiratory Protection Plan          Appendix A                    11/29/12

7)  The test setup shall permit the person administering the test to observe the test subject inside the chamber during the test.

8)  The equipment generating the test atmosphere shall maintain the concentration of test agent constant to within a 10 percent variation for the duration of the test.

9)  The time lag (interval between an event and the recording of the event on the strip chart or computer or integrator) shall be kept to a minimum. There shall be a clear association between the occurrence of an event and its being recorded.

10) The sampling line tubing for the test chamber atmosphere and for the respirator sampling port shall be of equal diameter and of the same material. The length of the two lines shall be equal.

11) The exhaust flow from the test chamber shall pass through an appropriate filter (i.e., high efficiency particulate filter) before release.

12) When sodium chloride aerosol is used, the relative humidity inside the test chamber shall not exceed 50 percent.

13) The limitations of instrument detection shall be taken into account when determining the fit factor.

14) Test respirators shall be maintained in proper working order and be inspected regularly for deficiencies such as cracks or missing valves and gaskets.

(b) Procedural Requirements.

1)  When performing the initial user seal check using a positive or negative pressure check, the sampling line shall be crimped closed in order to avoid air pressure leakage during either of these pressure checks.

2)  The use of an abbreviated screening QLFT test is optional. Such a test may be used in order to quickly identify poor fitting respirators that passed the positive and or negative pressure test and reduce the amount of QNFT time. The use of the CNC QNFT instrument in the count mode is another optional method to obtain a quick estimate of fit and eliminate poor fitting respirators before going on to perform a full QNFT.

3)  A reasonably stable test agent concentration shall be measured in the test chamber prior to testing. For canopy or shower curtain types of test units, the determination of the test agent's stability may be established after the test subject has entered the test environment.

4)  Immediately after the subject enters the test chamber, the test agent concentration inside the respirator shall be measured to ensure that the peak penetration does not exceed 5 percent for a half mask or 1 percent for a full facepiece respirator.

16

Respiratory Protection Plan                    Appendix A                              11/29/12

5) A stable test agent concentration shall be obtained prior to the actual start of testing.

6) Respirator restraining straps shall not be over-tightened for testing. The straps shall be adjusted by the wearer without assistance from other persons to give a reasonably comfortable fit typical of normal use. The respirator shall not be adjusted once the fit test exercises begin.

7) The test shall be terminated whenever any single peak penetration exceeds 5 percent for half masks and 1 percent for full facepiece respirators. The test subject shall be refitted and retested.

8) Calculation of fit factors.
(i) The fit factor shall be determined for the quantitative fit test by taking the ratio of the average chamber concentration to the concentration measured inside the respirator for each test exercise except the grimace exercise.

(ii) The average test chamber concentration shall be calculated as the arithmetic average of the concentration measured before and after each test (i.e., 7 exercises) or the arithmetic average of the concentration measured before and after each exercise or the true average measured continuously during the respirator sample.

(iii) The concentration of the challenge agent inside the respirator shall be determined by one of the following methods:

   (A) Average peak penetration method means the method of determining test agent penetration into the respirator utilizing a strip chart recorder, integrator, or computer. The agent penetration is determined by an average of the peak heights on the graph or by computer integration, for each exercise except the grimace exercise. Integrators or computers that calculate the actual test agent penetration into the respirator for each exercise will also be considered to meet the requirements of the average peak penetration method.

   (B) Maximum peak penetration method means the method of determining test agent penetration in the respirator as determined by strip chart recordings of the test. The highest peak penetration for a given exercise is taken to be representative of average penetration into the respirator for that exercise.

   (C) Integration by calculation of the area under the individual peak for each exercise except the grimace exercise. This includes computerized integration.

   (D) The calculation of the overall fit factor using individual exercise fit factors involves first converting the exercise fit factors to penetration values, determining the average, and then converting that result back to a fit factor

9) The test subject shall not be permitted to wear a half mask or quarter facepiece respirator unless a minimum fit factor of 100 is obtained, or a full facepiece respirator unless a minimum fit factor of 500 is obtained.

17

Respiratory Protection Plan              Appendix A                    11/29/12

10) Fit test factors for the District of Columbia Fire and EMS Department are found in Appendix E of the Respiratory Protection Plan.

11) Filters used for quantitative fit testing shall be replaced whenever increased breathing resistance is encountered, or when the test agent has altered the integrity of the filter media.

3. Ambient aerosol condensation nuclei counter (CNC) quantitative fit testing protocol.

The ambient aerosol condensation nuclei counter (CNC) quantitative fit testing protocol quantitatively fit tests respirators with the use of a probe. The probed respirator is only used for quantitative fit tests. A probed respirator has a special sampling device, installed on the respirator that allows the probe to sample the air from inside the mask. A probed respirator is required for each make, style, model, and size that the employer uses and can be obtained from the respirator manufacturer or distributor. The CNC instrument manufacturer also provides probe attachments that permit fit testing in an employee's own respirator.

A minimum fit factor pass level of at least 100 is necessary for a half-mask respirator and a minimum fit factor pass level of at least 500 is required for a full facepiece negative pressure respirator. The entire screening and testing procedure shall be explained to the test subject prior to the conduct of the screening test.

(a) CNP Fit Test Requirements.

1) Check the respirator to make sure the sampling probe and line are properly attached to the facepiece and that the respirator is fitted with a particulate filter capable of preventing significant penetration by the ambient particles used for the fit test (e.g., NIOSH 42 CFR 84, Series 100, Series 99, or Series 95 particulate filter) per manufacturer's instruction.

2) Instruct the person to be tested to don the respirator for five minutes before the fit test starts. This purges the ambient particles trapped inside the respirator and permits the wearer to make certain the respirator is comfortable. This individual shall already have been trained on how to wear the respirator properly.

3) Check the following conditions for the adequacy of the respirator fit: Chin properly placed; Adequate strap tension, not overly tightened; Fit across nose bridge; Respirator of proper size to span distance from nose to chin; Tendency of the respirator to slip; Self-observation in a mirror to evaluate fit and respirator position.

4) Have the person wearing the respirator do a user seal check. If leakage is detected, determine the cause. If leakage is from a poorly fitting facepiece, try another size of the same model respirator, or another model of respirator.

5) Follow the manufacturer's instructions for operating the Portacount and proceed with the test.

18

6) The test subject shall be instructed to perform the exercises in section I. A. 14. of this appendix.

7) After the test exercises, the test subject shall be questioned by the test conductor regarding the comfort of the respirator upon completion of the protocol. If it has become unacceptable, another model of respirator shall be tried.

(b) CNP Test Instrument.

1) The instrument will automatically stop and calculate the overall fit factor for the entire set of exercises. The overall fit factor is what counts. The Pass or Fail message will indicate whether or not the test was successful. If the test was a Pass, the fit test is over.

2) Since the pass or fail criterion of the instrument is user programmable, the test operator shall ensure that the pass or fail criterion meet the requirements for minimum respirator performance in Appendix E.

3) A record of the test needs to be kept on file, assuming the fit test was successful. The record must contain the test subject's name; overall fit factor; make, model, style, and size of respirator used; and date tested.

19

# Appendix B-1

# District of Columbia Fire and EMS Department Respiratory Protection Plan

# User Seal Check Procedures

The individual who uses a tight-fitting respirator is to perform a user seal check to ensure that an adequate seal is achieved each time the respirator is put on. Either the positive and negative pressure checks listed in this appendix, or the respirator manufacturer's recommended user seal check method shall be used. User seal checks are not substitutes for quantitative or qualitative fit tests.

1. Facepiece Negative Pressure Checks

> Negative pressure check: Close off the inlet opening of the canister or cartridge(s) by covering with the palm of the hand(s) or by replacing the filter seal(s), inhale gently so that the facepiece collapses slightly, and hold the breath for ten seconds. The design of the inlet opening of some cartridges cannot be effectively covered with the palm of the hand. The test can be performed by covering the inlet opening of the cartridge with a thin latex or nitrile glove. If the facepiece remains in its slightly collapsed condition and no inward leakage of air is detected, the tightness of the respirator is considered satisfactory.

2. Manufacturer's Recommended User Seal Check Procedures

> The respirator manufacturer's recommended procedures for performing a user seal check may be used instead of the negative pressure check procedures. User seal check procedures for the Scott 50 SCBA are found in Chapter 5 of the SCBA Manual.

# Appendix B-2

# District of Columbia Fire and EMS Department Respiratory Protection Plan

# Respirator Cleaning Procedures

Respirator cleaning procedures used by the Department follow the recommended guidelines of the manufacturer. These procedures ensure that the respirator is properly cleaned and disinfected in a manner that prevents damage to the respirator and does not cause harm to the user.

1. Procedures for Cleaning Respirators.

See the District of Columbia Fire and EMS Department Self Contained Breathing Apparatus Manual, Chapter 6:

> A. Cleaning and Disinfecting the Facepiece Assembly;
> B. Cleaning and Disinfecting the Breathing Regulator.

2. The remainder of the unit, air supply cylinder, backframe and harness assembly, shoulder and waist straps, and pressure reducing regulator should be damp-sponged to remove accumulated soot and debris.

3. Each member is responsible for ensuring that his or her assigned respiratory equipment is inspected, cleaned, and disinfected after each use.



Government of the District of Columbia
**Fire and Emergency Medical Services Department**
Washington, D.C. 20001
Respiratory Medical Questionnaire



Muriel Bowser
Mayor

Gregory M. Dean
Fire and EMS Chief

**Part A. Section 1**. Every employee who has been selected to use any type of respirator (please print) must provide the following information.

Today's Date: _____     Date of Birth: _____

Name: _____     Last 4 digits of SSN: _____

Job Title: _____     Sex:     Male ☐     Female ☐

Home Phone: _____     Height: ____ (ft.) ___ (in)   Weight _____ (lbs.)

Work Phone: _____

Can you read English?     …………………………………………………..…………     Yes ☐   No ☐

Has your employer told you how to contact the health care professional who will review this?     Yes ☐   No ☐

**Check the type of respirator you possibly can wear or have worn in the past (you can check more than one category):**

☐ Disposable respirator N-95                    ☐ Supplied-Air

☐ Positive Air Pressure Respirator (PAPR)       ☐ Self-Contained Breathing Apparatus

☐ Drager Long Duration Breathing Apparatus      ☐ Half-Face/Scott Xcel

☐ Full-Facepiece (Scott NBC Canister)

Physical exertion while wearing a respirator     ☐ Mild          ☐ Moderate          ☐ Strenuous

Maximum time you wear a respirator in a single day?:     ____hours

Do you exercise? …………………………………………………………………....     Yes ☐   No ☐

If 'yes,' describe how often and what exercise activities are: _____

D.C. 2019-cv-03099 (ABJ) - 000183


Muriel Bowser
Mayor

Government of the District of Columbia
Fire and Emergency Medical Services Department
Washington, D.C. 20001
Respiratory Medical Questionnaire


Gregory M. Dean
Fire and EMS Chief

**Part A. Section 2.** Questions 1 through 9 below must be answered by every employee who has been selected to use any type of respirator (please select "yes" or "no").

**1.  Do you currently smoke tobacco, or have you smoked tobacco in the last month?**   Yes ☐   No ☐

If Yes, how many packs per day?   ☐ ½ or less   ☐ 1   ☐ 2   ☐ 2 or more
How many years have you smoked?   ☐ 1-9   ☐ 10-19   ☐ 20-29   ☐ 30 or more

**2.  Have you ever had any of the following conditions?**

Seizures (fits)   Yes ☐   No ☐

Diabetes (sugar disease)   Yes ☐   No ☐

Allergic Reactions that interfere with your breathing   Yes ☐   No ☐

Claustrophobia (fear of closed-in places)   Yes ☐   No ☐

Trouble Smelling Odors   Yes ☐   No ☐

**3.  Have you ever had any of the following pulmonary or lung problems?**

Asbestosis   Yes ☐   No ☐

Asthma   Yes ☐   No ☐

Chronic Bronchitis   Yes ☐   No ☐

Emphysema   Yes ☐   No ☐

Pneumonia   Yes ☐   No ☐

Tuberculosis   Yes ☐   No ☐

Silicosis   Yes ☐   No ☐

Pneumothorax (collapsed lung)   Yes ☐   No ☐

Lung Cancer   Yes ☐   No ☐

Broken ribs   Yes ☐   No ☐

Any chest injuries or surgeries:   Yes ☐   No ☐

Any other lung problem that you've been told about   Yes ☐   No ☐



Government of the District of Columbia
Fire and Emergency Medical Services Department
Washington, D.C. 20001

Muriel Bowser
Mayor

Gregory M. Dean
Fire and EMS Chief

**4.   Have you ever lost vision in either eye (temporarily or permanently)?**   Yes ☐   No ☐

**5.   Do you currently have any of the following?**

Wear glasses   Yes ☐   No ☐

Wear contact lenses   Yes ☐   No ☐

Color blind   Yes ☐   No ☐

Any other eye or vision problem   Yes ☐   No ☐

**6.   Have you ever had an injury to your ears, including a broken ear drum?**   Yes ☐   No ☐

**7.   Do you currently have any of the following hearing problems?**

Difficulty hearing   Yes ☐   No ☐

Wear a hearing aid   Yes ☐   No ☐

Any other hearing or ear problem   Yes ☐   No ☐

**8.   Have you ever had a back injury?**   Yes ☐   No ☐

**9.   Do you currently have any of the following musculoskeletal problems?**

Weakness in any of your arms   Yes ☐   No ☐

Back pain   Yes ☐   No ☐

Difficulty fully moving your arms and legs   Yes ☐   No ☐

Pain or stiffness when you lean forward or backward at the waist:   Yes ☐   No ☐

Difficulty fully moving your head up and down   Yes ☐   No ☐

Difficulty fully moving your head side-to-side   Yes ☐   No ☐

Difficulty bending at your knees   Yes ☐   No ☐

Difficulty squatting to the ground   Yes ☐   No ☐

Difficulty climbing a flight of stairs or ladder carrying more than 25 lbs.   Yes ☐   No ☐

Any other muscle or skeletal problem that interferes with using a respirator   Yes ☐   No ☐

**Any additional comments you would like to make:**

D.C. 2019-cv-03099 (ABJ) - 000185



Muriel Bowser
Mayor

Government of the District of Columbia
Fire and Emergency Medical Services Department
Washington, D.C. 20001

Gregory M. Dean
Fire and EMS Chief

To the best of my knowledge, the information I have provided is true and accurate.

**Employee Signature** _____   **Date:** _____

## TO BE COMPLETED BY THE POLICE & FIRE CLINIC (PFC):

*This employee has been found to be physically able to us the following (check each [ ] that applies):*

☐ Disposable respirator N-95                    ☐ Positive Air Pressure Respirator (PAPR)

☐ Half-Face/Scott Xcel                          ☐ Supplied-Air

☐ Full-Facepiece (Scott NBC Canister)           ☐ Self-Contained Breathing Apparatus

☐ Drager – Long Duration Breathing Apparatus

*Restrictions / Limitations (if any) when wearing a respirator*

☐ The mandatory questionnaire has been reviewed, and the employee has been found to be physically able to use respirator.

☐ This employee has been found to be physically NOT able to use respirator.

_____   _____   _____

Reviewer's Name (Print)            Reviewer's Signature               Date:

Additional Comments:

D.C. 2019-cv-03099 (ABJ) - 000186

# Appendix D

# Information for Employees Using Respirators When Not Required Under the Standard

Respirators are an effective method of protection against designated hazards when properly selected and worn. Respirator use is encouraged, even when exposures are below the exposure limit, to provide an additional level of comfort and protection for workers. However, if a respirator is used improperly or not kept clean, the respirator itself can become a hazard to the worker. Sometimes, workers may wear respirators to avoid exposures to hazards, even if the amount of hazardous substance does not exceed the limits set by OSHA standards. If your employer provides respirators for your voluntary use, of if you provide your own respirator, you need to take certain precautions to be sure that the respirator itself does not present a hazard.

You should do the following:

1. Read and heed all instructions provided by the manufacturer on use, maintenance, cleaning and care, and warnings regarding the respirators limitations.

2. Choose respirators certified for use to protect against the contaminant of concern. NIOSH, the National Institute for Occupational Safety and Health of the U.S. Department of Health and Human Services, certifies respirators. A label or statement of certification should appear on the respirator or respirator packaging. It will tell you what the respirator is designed for and how much it will protect you.

3. Do not wear your respirator into atmospheres containing contaminants for which your respirator is not designed to protect against. For example, a respirator designed to filter dust particles will not protect you against gases, vapors, or very small solid particles of fumes or smoke.

4. Keep track of your respirator so that you do not mistakenly use someone else's respirator.

The Department may provide respirators at the request of employees or permit employees to use their own respirators, if the Department determines that such respirator use will not in itself create a hazard. If the Department determines that any voluntary respirator use is permissible, the Department shall provide the respirator users with the information contained in Appendix D.

In addition, the Department must establish and implement those elements of a written respiratory protection program necessary to ensure that any employee using a respirator voluntarily is medically able to use that respirator, and that the respirator is cleaned, stored, and maintained so that its use does not present a health hazard to the user. Exception: The Department is not required to include in a written respiratory protection program those employees whose only use of respirators involves the voluntary use of filtering facepieces (dust masks).

GO 13-2005

# Appendix E

# Fit Test Standard

Fit Test Standards are minimum levels of protection that provide the employee with assurance that his or her respirator is capable of providing an adequate level of protection from toxic and harmful atmospheres.

All fit testing shall be administered using an OSHA-accepted Quantitative (QNFT) or Qualitative (QLFT) protocol. The OSHA-accepted QNFT and QLFT protocols and procedures are contained in Appendix A of this section. QLFT may only be used to fit test negative-pressure air-purifying respirators that must achieve a fit factor of 100 or less

For Qualitative (QLFT) testing using Bitrex, the test subject shall indicate to the test conductor if at any time during the fit test the taste of Bitrex is detected. If the test subject does not report tasting the Bitrex, the test is passed.

Quantitative (QNFT) testing will be conducted to achieve a fit test factor that exceeds OSHA guidelines for Air Purifying Respirators. All members must meet or exceed a minimum fit test factor of 500.

# Appendix F

# SCBA Manual

Appendix F of the District of Columbia Fire and EMS Department Respiratory
Protection Plan is the Self-Contained Breathing Apparatus (SCBA) Manual.

# EXHIBIT 16

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF COLUMBIA

3   -------------------------------------x

4   ELLIS POLLARD,                          :

5        -v-    Plaintiff,                  : Civil Action No.

6   DISTRICT OF COLUMBIA,                   : 1:19-cv-30999(ABJ)

7               Defendant.                  :

8   -------------------------------------x

9

10              Virtual Deposition of

11              STACY KAHATAPITIYA, CHMM

12              Thursday, January 6, 2022

13                 2:13 P.M. EST

14

15

16

17

18

19

20   Job No.: 420443

21   Pages: 1 - 125

22   Reported by: Fazier Walle

1                    Virtual Deposition of STACY

2    KAHATAPITIYA, CHMM, taken on Tuesday, January 6,

3    2022, at 2:13 P.M. EST.

4

5

6

7

8

9

10                   Pursuant to Plaintiff's Notice of

11   Deposition, before Fazier Walle, a Shorthand Court

12   Stenographer and Notary Public in and for the

13   State of Maryland.

14

15

16

17

18

19

20

21

22

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF:

 3          ELLEN K. RENAUD, ESQUIRE

 4          TAMARA L. SLATER, ESQUIRE

 5          ALAN LESCHT & ASSOCIATES, P.C.

 6          1825 K Street, N.W.

 7          Suite 750

 8          Washington, D.C. 20006

 9          (202)463-6036

10

11   ON BEHALF OF DEFENDANT:

12          MARTHA J. MULLEN, ESQUIRE

13          JOHN J. BARDO, ESQUIRE

14          OFFICE OF ATTORNEY GENERAL FOR THE

15          DISTRICT OF COLUMBIA

16          400 6th Street, N.W.

17          Washington, D.C. 20001

18          (202)727-3400

19

20

21

22
```

1    extra smalls, smalls, medium, larges; right?

2    Everybody has different face structure.  So a fit

3    test is meant to ensure that the seal and the fit

4    that you're getting when challenged by either

5    quantitative or qualitative testing is adequately

6    protecting you as the respirator is intended to.

7            And then, that goes into calculation with

8    a fit factor, which is a number system that tells

9    you how protective a certain type of respirator is.

10   Q    So if a person passes the fit test, are

11   they guaranteed to have an adequate seal at other

12   times?

13   A    Well --

14        (Simultaneous speakers.)

15        MS. MULLEN:  Well, objection as to form.

16        But go ahead and answer.

17   A    So the fit test is done annually, and a

18   fit test is predicated on the conditions that were a

19   part of the fit testing that happened being the

20   same.  So you can have difference in results if you

21   have dental work, if you have scarring, if you have

22   weight gain or weight loss, if you have scar tissue,

1    within the face and the seal area.  So it's a

2    regulatory requirement.

3         Q    Okay.  So your opinion is, regardless of

4    whether a person can pass a fit test, a person with

5    a beard should not be working in the field; correct?

6              (Simultaneous speakers.)

7         Q    In -- I'm sorry -- in hazardous

8    conditions.

9              MS. MULLEN:  Well, objection to the form

10   of the question.

11             You have may go ahead and answer.

12        A    It depends not on their field, but it

13   depends on their respiratory equipment and their

14   personal protective equipment that they need to

15   wear --

16        Q    Okay.

17        A    -- in order to safely work in that

18   environment.

19        Q    So is it your opinion that a person with a

20   beard should not be wearing SCBA respirator?

21        A    If that beard is within the face seal

22   area, yes.

1   than regulation.

2          But in this manner, right, common sense

3   would tell you that if you have something that's

4   protruding from your face that would push away from

5   the seal of the respirator, that would leave a gap

6   to -- if you have air flowing in to potentially flow

7   out.  That would also leave a gap there for things

8   to flow inward.

9      Q    Well, wouldn't common sense also tell you

10  that if somebody passes a fit test that the seal is

11  not larger than it should be?

12     A    Again --

13          (Simultaneous speakers.)

14          MS. MULLEN:  Objection as to form.

15          You can answer.

16     A    Again, the fit test -- you are intended to

17  be able to pass a fit test every time you wear that

18  respirator.  And so if your physical features are

19  changing on a day-to-day basis because you have

20  facial hair, then you are not guaranteed that you're

21  wearing a respirator in the same condition that you

22  got a fit test in.

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2       FAZIER WALLE, the officer before whom the

3    foregoing deposition was taken, do hereby certify

4    that the foregoing transcript is a true and

5    correct record of the testimony given; that said

6    testimony was taken by me stenographically and

7    thereafter reduced to typewriting under my

8    direction; that reading and signing STACY

9    KAHATAPITIYA, CHMM requested; and that I am

10   neither counsel for, related to, nor employed by

11   any of the parties to this case and have no

12   interest, financial or otherwise, in its outcome.

13      IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 6th day of

15   January, 2022.

16   My commission expires:

17   March 26, 2022

18

19   _Fazier Walle_

20   _____

21

22

**EXHIBIT 17**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ELLIS POLLARD,

        *Plaintiffs,*

   v.

DISTRICT OF COLUMBIA,

        *Defendant.*

Case No. 2019-cv-03099 (ABJ)

## DISTRICT OF COLUMBIA'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, Defendant provides the following responses and objections to Plaintiffs' First set of Interrogatories.

(a) The word usage and sentence structure may be that of the attorney assisting in the preparation of these answers and thus does not necessarily purport to be the precise language of the executing party.

(b) Defendant may amend, revise, or supplement his responses pursuant to Fed. R. Civ. P. 26(e) if and when new or different information becomes available.

(c) For any additional responsive information made available through deposition testimony, Defendant incorporates such information for the purposes of giving the Plaintiff notice that such information exists but does not adopt such testimony as accurate and complete.

(d) Pursuant to Federal Rule of Civil Procedure 33(d), where "the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding

party may answer by [s]pecifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could."

## GENERAL OBJECTIONS

1.      These objections are made without waiving or intending to waive, but rather intending to preserve and preserving: (a) all objections to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose in the trial of this or any other action or any subsequent proceeding; (b) the right to object to the use of any information that may be disclosed in the trial of this or any other action or any subsequent proceeding on any grounds; (c) the right to preserve, prior to disclosure and as a condition of disclosure, the confidentiality or the proprietary nature of any information that may be provided; (d) the right to object on any grounds at any time to a demand for further information or other discovery involving or relating to the subject matter of the Interrogatories; (e) the right to revise, supplement, clarify, or amend the objections and responses to the Interrogatories at any time if further factual developments or analysis warrants a modification, of if additional information is obtained that is properly called for by the Interrogatories.

2.      Each objection set forth in this section shall apply to each of the Interrogatories as if that objection were set forth in full in response to each interrogatory and is not necessarily repeated in response to each individual Interrogatory.  The assertion of the same, similar, or additional objections in defendant's specific objections to individual Interrogatories, or the failure to assert any additional objection to an Interrogatory, shall not waive any of Detective Booher's objections set forth in this section or the following sections.  Each objection to the Interrogatories, or to any of them, includes and incorporates an objection to any related Instructions and/or Definitions.

3.      Defendant objects to each Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege or doctrine.  Nothing contained in these objections or the responses to individual Interrogatories is intended as, or shall in any way be deemed as, a waiver of any attorney-client privilege, any work product doctrine, or any other applicable privilege or doctrine.  Inadvertent disclosure of any such protected information shall not constitute a waiver of any privilege or any other grounds for objection to discovery with respect to such information or any other information, nor shall such inadvertent disclosure waive Defendant's right to object to the use of any such information during this or any subsequent proceeding.

4.      Defendant objects to each of the "definitions" and "instructions" to the extent that they seek to impose obligations beyond those consistent with the Court Rules.  Defendant further objects to the extent that the "definitions" and "instructions" are overly broad and unduly burdensome and seek to impose an obligation to produce irrelevant information or information not reasonably calculated to lead to the discovery of relevant or admissible evidence. Specifically, but not exclusively, Defendant objects to Plaintiff's definition and characterization of "discipline" as overbroad and contrary to relevant case law, statutes and regulations. Defendant further objects that Plaintiffs' Instruction with regard to the identification of documents is unduly burdensome especially in light of the Defendant's document production and in light of the fact that the Plaintiffs may already be in possession of all related documents.

5.      Defendant objects to the extent that the Interrogatories are overbroad in that they seek information for an unlimited period of time after the alleged occurrence.

## ANSWERS

1.     Identify by Interrogatory number each person answering or consulted in answering these interrogatories.  State each person's time in his/her current position, identify his/her current position, and identify his/her immediate supervisor.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, and confidential personal information of  current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy.  Without waiving any objections, John J. Sollers, the Assistant Fire Chief for Services is executing these interrogatories on behalf of the Defendant.

2.     Identify each and every person who has administered a fit test (or any test or procedure to determine whether there is an adequate seal between the face and facepiece for a firefighter's breathing apparatus) to one or more of your employees from January 2010 to the present.  For each person identified, state the person's precise job title, date of hire, his/her supervisor(s) and/or managers, his/her Division and Bureau, his/her current employment status and describe each such employee's training and qualifications to administer such tests.

**ANSWER:** The District objects to this interrogatory as overly broad and disproportionate to the needs of the case, and unlikely to lead to discovery of admissible evidence.  Without waiving any objections, the fit tests are administered by Willie Gilliam and other employees of Municipal Emergency Services, a private contractor.

3.     Please set forth in detail all facts and all evidence that support your decision not to assign Plaintiff to perform firefighting duties in the field.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, the deliberative process privilege and because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy.  Without waiving any objections, Plaintiff was unable to pass his fit test making it impossible to perform field tasks without threatening his health and safety.

4.      Identify each and every person who took part in advising, evaluating, recommending, proposing, deciding and/or approving the decision to remove Plaintiff from the field.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, the deliberative process privilege, and confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy.  Without waiving any objections, the District identifies Assistant Fire Chief David Foust, and Deputy Fire Chief Kenneth Crosswhite.

5.       Identify all protocols, rules, procedures and any other form of guidance followed by the Fire Department with regard to personal protective equipment.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by attorney-client privilege the work product doctrine, and the deliberative process privilege.  Without waiving any objections, see bates no. 000001-190.

6.      For each person, other than an expert, with knowledge of the facts and circumstances related to the allegations in the Amended Complaint, provide his or her name, address, telephone

number, state the nature and/or substance of that person's knowledge, and provide a clear and concise statement of any testimony which you may elicit from such witness at the trial of this case. For each individual listed, state the last time you or anyone acting on your behalf contacted that individual and whether that person has provided any written statement related to the allegations in the Amended Complaint.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, and because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy. Without waiving any objections, the District identifies Assistant Fire Chief David M. Foust, Chief of Staff Amy Mauro, EEO Officer Kim McDaniel, Assistant Fire Chief Craig Baker, Assistant Fire Chief Milton Douglas, Management Analyst Kevette Bishop, Deputy Fire Chief Kenneth Crosswhite, and Assistant Fire Chief Raymond Gretz.

7.     For each occasion that a fit test was administered to the Plaintiff, state the date the test was administered, the name of the person(s) administering the test, identify any other person present during the test, state whether Plaintiff passed or failed the fit test, provide any score or other measure of the success or failure of each fit test, state the duration of each test, describe how each test was administered including any steps taken to ensure the accuracy of the results.

**ANSWER:** The District objects to this interrogatory because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6,

and as it constitutes an unwarranted invasion of personnel privacy.  Without waiving any

objections, see bates no. 000239-241.

8.      Identify any employee who has had a fit test by another fire department or entity, such as

the Fairfax County Fire and Rescue Department, in the last ten years.  For each employee,

identify the entity(-ies) administering any fit test, the date(s) on which any fit tests were

administered, the outcome of the fit test, and the reason each employee was sent to an outside

entity for a fit test(s).

        **ANSWER:** The District objects to this interrogatory as irrelevant, immaterial, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence at

trial, and because it seeks confidential personal information of current and former employees, the

non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B

3105, 3112, and 3113.6, and constitutes an unwarranted invasion of personnel privacy.  Without

waiving any objections, the District does not keep such records in the ordinary course of business

and therefore does not have any responsive information.

9.      List and describe all types, including the brand and model, of personal protective

equipment for the face, that Defendant has purchased for its employees in the last ten years.

        **ANSWER:** The District has used the SCBA SCOTT AP-50 4.5 2007 edition since 2008.

The District used 3M 9105 or 9105s (N95 Masks) from 2017 until March 2020.

10.     Identify all persons employed by Defendant who, in the last ten years, have failed a fit

test, state the person's position, whether the person wore a beard, whether, and the number of

times, the person was permitted to retake the fit test, and the results of the fit test.

        **ANSWER:** The District objects to this interrogatory to the extent it seeks information

protected by attorney-client privilege, the work product doctrine, the deliberative process

privilege, and confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6 of the District Personnel Manual, and as it constitutes an unwarranted invasion of personnel privacy.  Without waiving any objections, the District does not keep records in the ordinary course of business, noting why the candidate failed or whether the candidate had facial hair such as a beard.  Employees who fail the fit test are able to retest X times.  Information on fit tests administered in the past five years are in the following chart:

| Year | Number of fit tests | Number of employees who failed fit test |
|------|---------------------|------------------------------------------|
| 2015 | 1,412 | 5 |
| 2016 | 847 | 3 |
| 2017 | 1,249 | 1 |
| 2018 | 632 | 0 |
| 2019 | 1,571 | 0 |
| 2020 | 364 | 1 |

Discovery is ongoing and the District reserves the right to supplement its response as needed.

11.    If Plaintiff was ever provided with a seal kit or any other accommodation for his beard and/or atypical facial features, please provide the date the seal kit or other accommodation was provided and identify the person who provided the seal kit or other accommodation to plaintiff.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by attorney-client privilege, the work product doctrine, and because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy.  The District further objects because the interrogatory seeks information equally available to Plaintiff, and the District is unaware of the meaning of the term "seal kit."  Without waiving any objections, on September 15, 2017 Plaintiff was provided with foam inserts to help him pass the fit test, but Plaintiff did

8

not pass.  Discovery is ongoing and the District reserves the right to supplement its response as needed.

12.        Identify each and every person in the Fire Department responsible for the upkeep, maintenance and/or proper functioning of Plaintiff's mask including his lens.

**ANSWER:** The District objects to this interrogatory because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy.  Without waiving any objections, an employee is responsible for the upkeep of his or her own mask.  For additional information, Plaintiff is directed to bates no. 000001-190.

13.        Identify each person who has made a complaint about religious discrimination or retaliation against Defendant's Fire Department since 2010.  For each, provide the date the complaint was made, describe the allegations in detail, describe any investigation conduct and the outcome of the investigation including any discipline or consequence imposed and on whom.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, the deliberative process privilege, and confidential personal information of  current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy.  The District further objects to this interrogatory as overbroad, irrelevant, disproportionate to the needs of the case and unlikely to lead to discovery of admissible evidence.

14.        If you contend that Plaintiff has committed any misconduct, for each alleged incident of

misconduct describe (*See* above instructions regarding description) the alleged misconduct, the date the alleged incident of misconduct occurred and any witnesses to said incidents.

**ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, and because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy. The District further objects because the interrogatory seeks information equally available to Plaintiff. Without waiving any objections, see bates no. 000283-287.

15.     If you contend that any aspect of Plaintiff 's performance was not fully satisfactory in any manner, describe fully each and every assignment or task that you contend that Plaintiff performed in a less than fully satisfactory manner. Your answer should state the date that Plaintiff became responsible for the assignment or task, the date Plaintiff was to have completed the assignment or task and the date that Plaintiff's responsibility for the assignment or task ended. Your answer should also describe in detail any fact upon which you base your contention that Plaintiff performed the task or assignment in a less than fully satisfactory manner.

**ANSWER**: The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, and because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy. The District further objects because the interrogatory seeks information equally available to Plaintiff. Without waiving any objections, see bates no. 000283-287.

16.     Identify the make and model of each and every machine or device used by the Fire Department in the last ten years to perform fit tests?

    **ANSWER:** Occupational Health Dynamics aka OHD QUANTIFIT.

17.     Identify the software used for fit tests during the past ten years and the date the software was updated by the Fire Department.

    **ANSWER:** Fit Track Gold version 2.1.0.12.

18.     Identify all persons involved in the decision to select the fit test machines and software identified in response to interrogatories no. 15 and/or 16 and state each and every other machine and/or software that was considered by each such person and the reason that the other machine and/or software was not purchased by Defendant.

    **ANSWER:** The District objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine, the deliberative process privilege, and because the interrogatory seeks confidential personal information of current and former employees, the non-disclosure of which is protected under DC Code 1-631.01, 1031.03, and D.C. Mun. Reg 6-B 3105, 3112, and 3113.6, and as it constitutes an unwarranted invasion of personnel privacy.  Without waiving any objections, the selection of the equipment is made by the Assistant Fire Chief for Services, the Office of Risk Management and Information Technology.

July 10, 2020                          Respectfully submitted,

    I have read the foregoing answers to interrogatories, and they are true to the best of my knowledge, information, and belief.

_____
John J. Sollers
Assistant Fire Chief for Services

11

OBJECTIONS MADE BY COUNSEL

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

/s/ *Michael K. Addo*
MICHAEL K. ADDO [1008971]
Chief, Civil Litigation Division Section IV

/s/*Martha J. Mullen*
MARTHA J. MULLEN [419036]
Senior Assistant Attorney General
(202) 724-6612
martha.mullen@dc.gov

/s/ John Bardo
JOHN BARDO [1655534]
Assistant Attorney General
441 4th Street, N.W., 6th Floor South
Washington, D.C.  20001
(202) 724-6539
John.Bardo@dc.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

This certifies that on July 10, 2020, a true and correct copy of the foregoing was served

on Plaintiffs' attorney.

Ellen K. Renaud
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W., Suite 205
Washington, DC 20005
(202) 842-0300

/s/ *John Bardo*
JOHN BARDO

12

# EXHIBIT 18



**Government of the District of Columbia
Fire and Emergency Medical Services Department**



Muriel Bowser
Mayor

Gregory M. Dean
Fire & EMS Chief

<u>**MEMORANDUM**</u>

**TO:**      Gregory Dean
            Fire and EMS Chief

**FROM:**    David Foust
            Assistant Fire Chief — Services

**DATE:**    February 28, 2018

**SUBJECT:** Fit test to F/F Technician Ellis Pollard, Jr.

On Friday, February 23, 2018, I arrived at Engine Company 4 at 2531 Sherman Avenue, Washington, DC 20009 at 0900 hours to meet Firefighter Technician Ellis Pollard to oversee an administered "Fit Test" given by the departments fit test qualified technician/contractor. At the time of the fit test Firefighter Pollard possessed an AV2000 Model (face-piece)mask. I wanted to ensure that Firefighter Pollard was given his fit test with an AV3000 HT (face-piece) mask in every size available (small, medium, large). We spent approximately 90 minutes testing with these sizes.  However, Firefighter Pollard was issued a Model AV2000 facepiece which was tried and failed to provide a proper seal too.  Firefighter Pollard was given assistance with placing each size of facepiece, (evenly situated, and pulled tightly to his face) to gain a proper seal. The testing technician applied foam padding to the inside of the mask under the seal of the mask, which is a product, provided by the facepiece manufacturer, to assist in gaining a proper seal.  The testing technician then contacted the facepeice manufacturer to gain further assistance or instructions of additional testing techniques to help gain a proper seal. Nothing more was available for Firefighter Pollard to try.  He was patient and understood that he was unsuccessful and did not pass his fit test. Firefighter Pollard had facial hair that was present that made contact with the seal of the mask during each test.

Frank D. Reeves Municipal Center
2000 14th Street NW, Suite 500
Washington, D.C.  20009

phone:    (202) 673–3320
facsimile: (202) 462–0807
www.fems.dc.gov